## THE STATE v. FAULKNER, Appellant.

### Division Two, June 9, 1903.

1. **Grand Jury:** EXTENT OF INQUIRY: BRIBERY: PERJURY: MATERIALITY.
It is the duty and the right of a grand jury that are investigating
a charge of bribery against one person to send for another and
inquire of him if he has any knowledge or information of a cor-
rupting fund which has been set aside by a street railway com-
pany to be paid to a combine of councilmen for a franchise ordi-
nance.   Knowledge or information of the existence of such a fund
and of the purposes for which it was to be used is material to a
proper investigation of such bribery charge, and if such other
falsely swears that he had no such knowledge or information he
is guilty of perjury.

2. **Perjury:** MATERIALITY OF INQUIRY.   The false statement made by
the defendant to the grand jury, in order to be material in a trial
for perjury, need not tend directly to prove the issue then under

investigation. If it be circumstantially material or if a true statement tend to support and give credit to a witness to the main fact, it will sustain an indictment for perjury.

3. ———: ———: IN COUNTY. A witness subpoenaed before a grand jury and interrogated as to his knowledge of a crime alleged to have been committed in the county in which the grand jury has lawfully been impaneled, may commit perjury by falsely swearing that he does not know of the commission of such a crime or does not know of any material fact constituting a link in the chain of evidence necessary to establish such offense.

4. ———: ———: BY WHOM DETERMINED. It is not for the witness before a grand jury to speculate upon the materiality of his knowledge of the offense under investigation. Nor is it for him to say that his testimony would be merely cumulative. A false reply to a material inquiry is perjury. It is material for the grand jury to obtain all competent evidence necessary to convict the one against whom the charge is being investigated of the offense being inquired into.

5. ———: ———: INDICTMENT: SUFFICIENCY. An indictment for perjury for falsely swearing before a grand jury in a bribery investigation is sufficient which simply alleges that a charge of bribery was pending before a grand jury against a member of a city council and that it became material to inquire whether a certain sum of money had been placed on special deposit in connection with said bribery, and that defendant upon his oath falsely swore that he did not know of nor had he ever heard of the existence of the said fund deposited in said place for the purpose of influencing or bribing or corrupting any of said councilmen for his vote or influence in the passage of a franchise ordinance for which said fund had been so set aside. In such case it is not necessary to allege all the particulars necessary to make a good indictment for bribery.

6. ———: ———: ———: "DEVELOPED:" REPUGNANCY. An indictment is not repugnant because it charges that a certain bribery had been "developed" before the grand jury when defendant was called and asked if he knew anything concerning a certain corruption fund which had been set aside in connection with said bribery, and falsely swore he did not, and that said inquiry was material. It was none the less material because certain other witnesses had testified concerning it. On the contrary, it was the duty of the grand jury to sift the matter thoroughly and procure all the material evidence obtainable to substantiate the bribery charge.

7. Special Jury: MANNER OF SELECTION. Following State v. Withrow, 133 Mo. 500, it is held that a special jury is not a jury drawn by chance from a wheel, but is one selected by the proper officer, in the exercise of judgment and discretion, from the general register of jurors in the city.

State v. Faulkner.

8. **Jury Panel**: INSPECTION. Where the punishment prescribed is not exceeding seven nor less than two years, counsel for defendant is not entitled to twenty-four hours' inspection of the panel of veniremen before their *voir dire* examination begins, but is entitled only to "a list of the panel before the jury is sworn, if he requires it."

9. ———: HOW SERVED. It is not necessary that the lists of veniremen be served on counsel by the sheriff. If handed to counsel by the clerk or court that is sufficient.

10. **Perjury**: CORROBORATIVE EVIDENCE. Where defendant before a grand jury swore he did not know of the existence of a certain bribery fund or the purposes for which it had been accumulated, the testimony of one witness on his trial for perjury is not sufficient to show that he swore falsely,- but such witness must be corroborated.

11. ———: BRIBERY: CORROBORATION: MATERIALITY OF EVIDENCE. The evidence established that there was a bill pending in the Municipal Assembly designed to grant a franchise to a street railway; that one Murrell, who represented himself as a representative of the House of Delegates, and the "legislative agent" of the railway, whose name was Stock, had formed an agreement that when the bill had passed both houses and been signed by the mayor, he would pay the members of the House $75,000; that this money was placed in a box in a safety deposit vault, to which both Murrell and Stock had a key, and that afterwards the grand jury went there, got the money, and it was identified on the trial. The defendant was a member of the House, and for swearing before the grand jury that he knew nothing of the deposit of the $75,000 in the safety vault. or the purposes for which it was to be used, he was indicted for perjury, and at his trial, to establish that he had sworn falsely, one Reiss testified that defendant had said to him that he understood Stock held a key to a box in the safety deposit vault, and that "the boys interested in the proposition" were a desperate lot, and unless the matter were fixed up they would make trouble, and that he otherwise indicated that it was to be used to bribe certain members of the House. *Held*, first, that the pertinent and material issue was to prove the falsity of defendant's evidence before the grand jury; second, the testimony of Reiss was material and competent for that purpose, but was not sufficient to convict without corroboration, but this corroborative testimony need not necessarily be tantamount to another witness, but must be sufficient to counterbalance the oath of the defendant, and the legal presumption of his innocence.

12. ———: ———: ———: CORROBORATIVE EVIDENCE: CORRUPT CONSPIRACY TO SELL LEGISLATION. To corroborate the evidence of Reiss the State undertook to show that defendant knew of the deposit of the $75,000 in the safety deposit vault and the corrupt purposes for which that was made, by offering evidence tending to show that

State v. Faulkner.

defendant was a member of what was termed "'the combine" of nineteen members in the House of Delegates. *Held*, that in order for this evidence to be corroborative it must show that "the combine" was for a corrupt purpose, and that a conspiracy, including defendant as one of its confederates, had been entered into between its members to pass the franchise bill, in which case what Murrell said in his absence and did in furtherance of the corrupt purposes of said conspiracy would bind defendant. But while the evidence shows that defendant was a member of the House, and that Murrell's offer was corrupt, and that nineteen members, including defendant, ordinarily voted together on all subjects and constituted a majority, and were denominated "the combine" by the city press and their fellow-members, it did not show that the franchise measure was ever discussed by said nineteen members, or that the question of their obtaining $75,000 or any other sum was ever considered by them when defendant was present or at any other time, or that Murrell ever named defendant as one of the members of the House who was to share in the $75,000, and while it did tend to show that defendant was a member of "the combine" or an agreement of certain members to vote together, it did not show that it was for the corrupt purposes of accepting bribes to further legislation. Therefore, this evidence was not sufficiently corroborative of Reiss's testimony to over-balance the evidence of defendant before the grand jury that he did not know of the deposit of the $75,000 or the corrupt purposes for which it was made, and the presumption of innocence which always attaches to a defendant indicted for crime.

13. **Circumstantial Evidence:** CHARACTER. The guilt of a defendant may be established by circumstantial evidence, but these circumstances must be consistent with his guilt, and inconsistent with his innocence.

14. **Corrupt Conspiracies:** GUILTY KNOWLEDGE. It is going too far to say that all members of a House of Delegates who go into party caucuses and conventions thereby commit themselves to the corrupt and illegal practices of some one or more members thereof, or have a guilty knowledge of such things. Nor does the fact that they are members thereof afford even a reasonable inference of such guilty knowledge.

15. ———: BRIBERY: PERJURY: INSTRUCTIONS. In such case the court's instructions should not only tell the jury that the fact that the defendant was a member of the House of Delegates was no evidence of his knowledge of the deposit of the $75,000 deposited by Murrell and Stock as the price for the legislative bribe, but they should go further and inform them that the fact that he was one of the majority or "combine" who ordinarily voted together was, by itself, no evidence of his knowledge of said bribe.

State v. Faulkner.

16. ———: HEARSAY: CONSPIRACY: EXPLANATION OF TESTIMONY. A witness for the State who on cross-examination has testified that he had heard the story of the raising of a corrupting fund for purchasing legislation, can not on his redirect examination, by way of explaining that statement, state that he got that information from a third party, who was a member of "the combine" of members of the legislative body, unless it is established that the defendant was a member of the corrupt combine with said third party and other councilmen to extort a bribe for the enactment of the bargained legislation, for unless such conspiracy is established the defendant can not be bound by what such third party said in his absence. If the conspiracy were shown such explanatory statement would have been competent on direct examination, and would not have in anywise been dependent on a previous cross-examination.

17. Evidence: PROFESSIONAL CONFIDENCE: ATTORNEY: STATUTE. The statute which renders "an attorney incompetent to testify concerning any communication made to him by his client in that relation or his advice thereon, without the consent of such client," is merely declaratory of the common law, and in no manner affects the exceptions to the general rule excluding such communications. That rule does not extend to nor shelter advice concerning or assistance in proposed infractions of the law.

18. ———: ———: ———: EFFORTS TO COMPROMISE A COMPLETED BRIBE. After a member of the House of Delegates and his associates in a city council had agreed with the agent of a street railway company to vote it a franchise in consideration of $75,000 to be paid to them by the company whenever the franchise ordinance should be signed by the mayor, and after the money had been placed, in keeping with that agreement, on special deposit for that purpose, and the bill had passed the House, but the other house had been prohibited by injunction from taking action, said member consulted an attorney for the purpose of enlisting his services in a compromise plan by which a part of the money would be turned over to the councilmen who had performed their part of the agreement. *Held*, that the proposition was a bald offer to divide the fruits of a crime with the attorney, and not a privileged communication, and was as much an infraction of the law as if it had been a "proposed infraction of the law," and the attorney was not, therefore, incompetent to testify concerning the communication so made to him. There can be no professional confidence as to such communication.

19. ———: ———: ———: ———: CONSPIRACY: HEARSAY. But the defendant made no such communication to the attorney, nor was there any evidence of a conspiracy between him and the one who did, or between him and the other councilmen, who made the agreement with the agent of the street railway company and superintended the deposit of the $75,000 corruption fund,

State v. Faulkner.

to pass the bill in consideration of the bribes. *Held,* that this communication made to the attorney, in the absence of this defendant, by a councilman indicted for the same crime, was mere hearsay, and incompetent for that reason.

20. **Attorney:** EMPLOYMENT: CRIME. An attorney can not be employed to assist one criminal in inducing a confederate to disgorge the price of their crime.

21. **Perjury:** INSTRUCTION: KNOWING AND HEARING. There is a radical distinction between knowing that a bribery has been committed and merely having heard of the fact.

22. ——: ——: ——: INDICTMENT. Where a defendant in an indictment for perjury has been charged with falsely swearing before a grand jury that he "did not know nor had he ever heard of the existence" of a certain corruption fund and the purposes for which it had been raised, "whereas in truth and in fact he then and there well knew of the existence of said sum," it is error to instruct the jury that they may find him guilty if they find that before the grand jury he "did then and there falsely swear and testify under oath that he did not know of and had never heard of the existence of the said sum." This instruction outran the indictment. The indictment only negatives defendant's evidence that he did not *know* of the existence of the fund, and when the instruction permitted his conviction if he *had heard* of that fund, it submitted an issue which was not in the case.

23. ——: KNOWLEDGE OF BRIBERY: LIMITATIONS: CONSPIRACY. Where defendant has been indicted for falsely swearing that he did not know that a certain corruption fund had been deposited in a trust company by a member of the House of Delegates and an agent of a street railway company, to be used in paying a bribe for the votes of certain members of the House of Delegates for passing a railway franchise, the knowledge of defendant should not by the instructions be limited to his actual seeing of the deposit made, or to information immediately derived from the agent of the company or from the said member, but, the charge being that said bribe grew out of a conspiracy between nineteen members of the House, for whom the said member was the representative in making said corrupt bargain, said knowledge may be inferred by a finding that defendant was a member and party to said conspiracy, if the jury should find it to actually exist and this bribe to be included in its corrupt purposes, in which case the defendant would be chargeable with the knowledge possessed by said member, and also with knowledge of the member's acts in furtherance of such conspiracy.

24. **Perjury:** AFTER INDICTMENT VOTED: MATERIALITY. The fact that the grand jury had voted to return, but had not returned into open court indictments against two other persons for bribery before they examined defendant as to his knowledge of their corrupt acts,

State v. Faulkner.

in no wise lessened the materiality of his testimony, nor made his false answers at that time any the less material in his subsequent trial for perjury.

25. **Self-Incrimination.** It is a universal principle of English and American law that "no person can be compelled to testify against himself in a criminal cause." This constitutional safeguard can not be abrogated because it may prove an inconvenient barrier to the investigation of some flagrant crime.

26. ———: WAIVER: PERJURY. A witness summoned before a grand jury in a bribery investigation may refuse to answer on the ground that his answers would tend to incriminate him. But he may waive that constitutional right by failing to claim it, and if he does so and falsely testifies, he may be indicted for perjury.

27. ———: BRIBERY: BY COMPANY. It is not necessary, in a perjury trial, that the bribery concerning which defendant falsely swore, was authorized by the board of directors of the company whose agent put up the money.

28. ———: MATERIALITY. The materiality of the testimony given by the defendant in a matter being investigated by the grand jury, is, in a subsequent trial of that witness for perjury, a question of law for the court.

29. ———: EVIDENCE OF BRIBERY IN OTHER ASSEMBLIES. Where defendant, a member of the House of Delegates, was indicted for perjury for falsely swearing that he did not know that a certain bribery fund of $75,000 had been placed in a trust company as a special deposit to be used in paying members of the House of Delegates for passing a street franchise, evidence tending to establish an agreement between the same agent of the company and a member of the council as to bribery of certain members of the council, is wholly irrelevant, and is prejudicial, since its effect could only be to prejudice the minds of the jury and impress them with the appalling extent to which corruption had crept into the Municipal Assembly.

30. **Guilty Defendant:** DUTY OF APPELLATE COURT. It is the duty of an appellate court, from which it can not in honor shrink, to require that, however guilty a defendant may be, and however appalling the extent of venality revealed by the record, he shall be punished only after having been accorded every right and guaranty which the organic and statutory law of the commonwealth secures to him.

Appeal from St. Louis City Circuit Court. — *Hon. Walter B. Douglas,* Judge.

REVERSED AND REMANDED.

*Thomas B. Harvey* for appellant; *Chas. P. Johnson* and *Thos. J. Rowe* of counsel.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, and *Jos. W. Folk* for the State.

GANTT, P. J.—At the December term, 1901, of the circuit court of the city of St. Louis for the disposition of criminal causes, to-wit, Division number 8 of said court, the grand jury, summoned from the body of said city, in open court preferred the following indictment against Harry A. Faulkner:

"'State of Missouri, City of St. Louis, ss.

"Circuit Court, City of St. Louis, December Term, 1901.

"The grand jurors of the State of Missouri, within and for the body of the city of St. Louis, now here in court, duly impaneled, sworn and charged, upon their oath present, that at the said city of St. Louis, on the 31st day of January in the year one thousand nine hundred and two, and during the December term, one thousand nine hundred and one, of said court, the grand jury of the State of Missouri, within and for the body of the city of St. Louis were then and there duly and legally convened, having been then and there duly and legally impaneled, sworn upon their oath and charged according to law in Division No. 8 of said court, and that a certain complaint was then and there made and presented before said grand jury against one Charles Kratz, and one John K. Murrell, and other persons, for the offense of bribery committed by the said John K. Murrell, Charles Kratz and others in said city of St. Louis, and that in the investigation and hearing of said complaint before said grand jury, so impaneled and sworn as aforesaid, it developed that in October and November, in the year one thousand and nine hun-

dred, there was pending in the Municipal Assembly of the city of St. Louis, consisting of a City Council and a House of Delegates, an ordinance known as Council Bill No. 44, and commonly known as the Suburban Railway Bill, same being a measure giving and granting to the St. Louis & Suburban Railway Company, a railroad corporation, certain rights, privileges and franchises, that one, John K. Murrell, was at said time a member of said House of Delegates, and that one, Charles Kratz, was at said time a member of said City Council, and that one, Philip Stock, was employed by said St. Louis & Suburban Railway Company, a corporation as aforesaid, to secure the passage of said ordinance by said Municipal Assembly, and that on or about November 30, 1900, the said John K. Murrell, member of the House of Delegates as aforesaid, went to said Philip Stock and stated that unless a large sum of money, to-wit, seventy-five thousand dollars, should be put up for the use and benefit of said House of Delegates, the said ordinance would not be passed by the said House of Delegates, but that if said Philip Stock, agent of the said St. Louis & Suburban Railway Company, would place with said John K. Murrell, the said sum of seventy-five thousand dollars, said ordiance would pass said House of Delegates, and after some conferences the said Philip Stock and the said John K. Murrell went to the Lincoln Trust Company, a corporation, with offices at number 700 Chestnut street, in what is known as the Lincoln Trust Building, and there said Philip Stock, in the presence of said John K. Murrell, deposited in lock box numbered one hundred and thirty-two, of the safe deposit vaults of the said Lincoln Trust Company, the sum of seventy-five thousand dollars, there being two keys to said box, said Philip Stock holding one key and the said John K. Murrell holding the other key, and that the said sum of money was deposited with the express understanding between said Philip Stock and said John K. Murrell

that upon said ordinance being passed by the House of Delegates, the City Council, and signed by the Mayor, the said sum of money would be turned over to the said John K. Murrell for his own use and benefit, and for the use and benefit of the other members of the House of Delegates he claimed to represent. That in said investigation one, Harry A. Faulkner, was duly summoned as a witness, and did then and there personally appear as a witness before said grand jury in regard to said complaint; that the said Harry A. Faulkner was then and there duly sworn by the foreman of the said grand jury and took upon himself his corporal oath, the said foreman, to-wit, one William H. Lee, being then and there duly and legally authorized and empowered, and having competent authority to administer the said oath to the said Harry A. Faulkner, and that then and there it became important and was material to the issue and to the investigation of said complaint by the said grand jury, whether the said Harry A. Faulkner had any knowledge or information of the existence of said sum of seventy-five thousand dollars, and of the purpose for which it was to be applied:

"And then and there he, the said Harry A. Faulkner, on his corporal oath and before the said grand jury, did feloniously, falsely, corruptly, knowingly, willfully, and maliciously depose and swear in substance and to the effect following: that he did not know nor had he ever heard of the existence of the said seventy-five thousand dollars deposited in the Lincoln Trust Company as aforesaid for the purpose of influencing, or bribing or corrupting any member of the House of Delegates for his vote or influence in the passage of said ordinance; whereas, in truth, and in fact, he, the said Harry A. Faulkner, then and there well knew of the existence of the said sum of seventy-five thousand dollars, and that said sum of seventy-five thousand dollars was deposited in a box in this safe deposit vault of said Lincoln Trust Company as a bribe

to be paid to the said John K. Murrell and other members of the House of Delegates whom he claimed to reprent, to influence their votes for and in favor of the passage and enactment of the said ordinance in the said House of Delegates; and so the grand jurors aforesaid, upon their oath aforesaid do say, that the said Harry A. Faulkner, at the city of St. Louis aforesaid, on the thirty-first day of January aforesaid, in the year aforesaid, in the manner and form aforesaid, feloniously, falsely, knowingly, willfully and corruptly committed willful and corrupt perjury contrary to the form of the statute and against the peace and dignity of the State."

The defendant was arrested and was duly arraigned and pleaded not guilty and was tried at the June term, 1902, and convicted and his punishment assessed at two years in the state penitentiary. After unsuccessful motions for a new trial and in arrest of judgment, he was duly sentenced, and from that judgment and sentence he has appealed to this court.

The facts necessary to a correct understanding of the rulings of the circuit court and the exceptions of defendant's counsel are in substance the following:

The State offered evidence proving and tending to prove that the Municipal Assembly of the city of St. Louis is composed of the House of Delegates and the City Council, constituting what is known as the Municipal Assembly. The defendant, Harry A. Faulkner, in 1900 and 1901, was a member of the House of Delegates branch of the Municipal Assembly. In September, October and November, 1900, there was in the said House of Delegates an organization or association, commonly called a combine, for the purpose of controlling legislation, and also, it was asserted by the State, for obtaining money for their votes. This combine consisted of nineteen members, and included John K. Murrell and the defendant Harry A. Faulkner. In October, 1900, there was introduced in the Municipal Assembly an ordinance known as Council Bill No. 44, giv-

ing and granting to the St. Louis & Suburban Railway Company certain privileges and franchises. The ordinance was introduced October 9th; it remained in the Council until February 8, 1901, when it passed that body and was referred to the House of Delegates. Numerous meetings of the Council took place from the date of the introduction of the bill before its final passage. While the bill was so pending before the Municipal Assembly, one John K. Murrell, a member of the House of Delegates and a member of the before-mentioned combine of nineteen members, of which the defendant was likewise a member, went to Philip Stock, who was "the legislative agent" of the St. Louis & Suburban Railway Company, and asked if he (Stock) represented the St. Louis & Suburban Railway Company; Stock told him that he did; Murrell thereupon said in effect, "I represent the House of Delegates and we want seventy-five thousand dollars from your company, and if you do not give it the bill will not pass, and if you do give it the bill will pass." Murrell further proposed that half of the amount be paid when the bill should pass the House of Delegates, and the other half when it became a law; Stock told him that he would not submit the proposition to his people, because he knew they would not accept it, but that if Murrell would make the proposition that the seventy-five thousand dollars should be paid after the bill had been passed and signed by the mayor, then he would submit it. This took place on October 17, 1900. Murrell next came to see Stock on October 22d of that year, and stated that he could not recede from his first proposition, because he was not sure that if a veto took place the Council would pass the bill over the veto; Stock said that that was all he could do in the matter, and Murrell thereupon handed Stock his card with the telephone numbers on it, and stated that if he wanted to see him, to telephone him. On November 19, 1900, Murrell again came to see Stock, and stated that the

proposition that seventy-five thousand dollars should be put up to be turned over after the bill had been passed and signed by the mayor would be accepted. Stock told him that he would make the money arrangements and would telephone Murrell when he was ready. On November 23d, Stock telephoned Murrell that the matter was all right, and to meet him the next day at the German Savings Institution at 10 o'clock. Murrell, in accordance with the appointment, met Stock the next morning at the German Savings Institution, where Mr. Richard Hospes, cashier of that bank, handed Mr. Stock a package of money wrapped up. The arrangements for this money had been made at the German Savings Institution by Charles H. Turner, president of the Suburban Railway Company, who had secured the services of Philip Stock in looking after the passage of the ordinance for the Suburban Railway Company. Stock had reported to Turner, the president of the railway company, the result of his conferences with Murrell, representing the House of Delegates, as a result of which Turner arranged with Mr. Hospes to turn over the seventy-five thousand dollars to Stock for the purposes indicated. After obtaining the seventy-five thousand dollars, Murrell and Stock went to the Lincoln Trust Company, and to the safety deposit department of the trust company, and rented lock box 132; they both signed their names to identification cards, and Murrell opened the package and counted the money and found it to be seventy-five thousand dollars, which he put in the box and locked up; there were two keys to the box; one was delivered to Murrell and the other to Stock, the agreement being that both must be present when the box should be opened, and that when the bill passed both houses and was signed by the mayor, it would be delivered to Murrell for the House of Delegates. As a further precaution a pass-word was selected, without which no one could have access to the box, and the word "carriage" was settled on as such

pass-word, because Murrell was in the carriage business.

Prior to this, in October, 1900, Charles Kratz, a member of the City Council, had approached Philip Stock and demanded the sum of sixty thousand dollars for the passage of the Suburban bill through the Council; it was finally arranged that the sum of sixty thousand dollars should be put up under the agreement that it should be paid to Charles Kratz for himself and other members of the Council when the Suburban bill became a law. Charles H. Turner, the president of the Suburban Railway Company, made arrangements at the German Savings Institution for the sixty thousand dollars, Philip Stock obtained the money, and together with John G. Brinkmeyer, who was representing Charles Kratz in the transaction, went to the Mississippi Valley Safety Deposit Department and rented a lock box, into which was placed the sixty thousand dollars, there being two keys to this box likewise, one being held by Stock and the other by Brinkmeyer, representing Kratz. Here also the agreement was that the box should not be opened unless both were present, and when the Suburban bill should become a law it should be opened and the sixty thousand dollars turned over to Brinkmeyer for Kratz.

After the ordinance passed the Council, as before stated, and was sent to the House of Delegates and referred to committee and before it was reported by the committee of the House, an injunction was issued by the circuit court of the city of St. Louis, enjoining the House of Delegates from taking action on the bill. This was in February, 1901. While the injunction proceedings were pending and in force, the House of Delegates expired by limitation in April, 1901, a new House of Delegates being elected. It appeared in evidence, however, that the combine of the old House of Delegates continued its existence for the purpose of securing the seventy-five thousand dollars, or a part of it, as the

members insisted they did all they could do, and it was not their fault that the bill was not passed. Efforts were made to compromise with Stock for part of the money. About the 18th of January, 1902, Murrell saw Stock and told him there would be a meeting of the boys of the old House of Delegates, and they wanted to compromise the matter for half, and that he (Murrell) would have to report to the meeting on Monday following. Stock told him he would not do anything in the matter at all further than to pay any expenses that Murrell had been to. Murrell then said, "The grand jury will take hold of it."

Paul Reiss for the State testified that in November or December, 1901, prior to the defendant testifying before the grand jury that he knew nothing of the corruption fund of seventy-five thousand dollars and had never heard of it, defendant in talking to said Reiss, a fellow-member of the House of Delegates from the Twenty-eighth ward, but who was not a member of the combine, said he understood that a brewer by the name of Stock held a key to the box in the Lincoln Trust Company, and that the boys interested in the proposition were a desperate lot, and unless the matter was fixed up, they would make trouble.

Again, on December 21, 1902, and about one week prior to the defendant's testifying before the grand jury denying all knowledge or information regarding the corruption fund, the defendant, Faulkner, went to Paul Reiss on the floor of the House of Delegates and asked him whether he had seen the Star-Sayings of that day; Reiss told him he had not; the defendant Faulkner then handed Reiss a paper and called his attention to an article referring to a meeting at the house of Edward Butler of the members of the combine. Reiss asked who had made the matter public; defendant Faulkner answered, "Those boys are desperate; they have held a meeting and got one of their number to give this to the press for the purpose of scaring Stock, to have him set-

tle up, and they will go before the grand jury in order to get the money.''

On January 30, 1902, the grand jury of the city of St. Louis had under investigation these charges of bribery against John K. Murrell and Chas. Kratz; a great many witnesses were summoned, and among others summoned before the grand jury was the defendant, Harry A. Faulkner. The defendant, after being duly sworn, was asked if he knew anything of the seventy-five thousand dollars in the lock box in the Lincoln Trust Company, or if he had ever heard anything about it or had any information concerning it; he swore that he did not know anything about it, had never heard of the seventy-five thousand dollars being there, and had no information concerning it, and that he had never heard of this seventy-five thousand dollars referred to directly or indirectly by any member of the House of Delegates, except as he had read in the newspapers.

On January 31st, the defendant, Faulkner, was recalled before the grand jury, and asked especially regarding the conversation with Mr. Reiss. He first said that he did not remember it, and persisted in giving that answer, but finally denied that he had any conversation with Reiss on the subject.

On the defendant's denial of knowledge or information concerning the corruption fund, he was indicted for perjury. Philip Stock, when summoned before the grand jury, confessed his part in the bribery scheme, and delivered the key to the box in the Lincoln Trust Company, and a committee from the grand jury, together with the circuit attorney, visited the Lincoln Trust Company, and lock box 132 was opened in the presence of the committee from the grand jury, the circuit attorney and officials of the trust company, and found to contain seventy-five thousand dollars. The evidence also showed that the box had not been opened

from the time John K. Murrell and Philip Stock had placed the package there until it was opened in the presence of the grand jurors, as aforesaid. The seventy-five thousand dollars was produced in court and identified by Stock as the same seventy-five thousand dollars deposited for the purpose of bribing the Suburban bill through the Municipal Assembly.

At the time that the defendant Faulkner was before the grand jury and gave the alleged false testimony for which he was indicted, the grand jury had voted to indict John K. Murrell and Charles Kratz in connection with the bribery matter, but the indictments had not been drawn up or signed and were not in fact found or returned into court until February 1, 1902. The grand jury, as shown by the evidence, after the voting of indictments against Murrell and Kratz, continued the investigation for the purpose of securing additional evidence as to them, and for the further purpose of getting proof, if possible, as to the other parties implicated in the transaction. It appeared from the facts and circumstances in the evidence that Murrell in negotiating with Stock, and having the seventy-five thousand dollars put up in the Lincoln Trust Company under the corrupt agreement as to the passage of the bill, asserted he was representing the combine in the House of Delegates and that the seventy-five thousand dollars was to go to the members of the combine upon the Suburban bill being passed and signed by the mayor.

The defendant, Harry A. Faulkner, was generally reputed to be a member of the combine, and generally voted with it on questions before the House of Delegates.

It further appeared in evidence, as showing the illegal purpose of the combine and the knowledge of its purpose as to the corruption fund as well as the intent as to the bribery, that Julius Lehman, another member of the combine, in May, 1901, went to Paul

Reiss, the same witness with whom the defendant had the conversation detailed above, and endeavored to secure the services of Reiss in seeing Stock and bringing about a settlement between Stock and "the boys" of the old House interested in the fund. Lehman in this conversation likewise displayed an acquaintance with the facts which he could only have acquired in the meetings of the combine and in hearing the report of John K. Murrell as to what he had done. This evidence also tended to show that the money was for "the boys" and was a circumstance indicating that the members of the combine knew of the deposit.

Various errors are assigned and we will proceed to their examination in the order of the appellant's brief.

## I.

The indictment is assailed, on the ground, *first*, that the averment therein that defendant testified under oath before the grand jury that "he *did not know of,* nor had he ever heard of the existence of the said $75,000, deposited in the Lincoln Trust Company, as aforesaid, for the purpose of influencing or bribing, or corrupting any member of the House of Delegates for his vote or influence in the passage of said ordinance," was immaterial, and we infer the argument to be that therefore perjury could not have been committed even if defendant did falsely so swear, since it is necessary to constitute the crime of perjury, that the false testimony should have reference to some material issue or inquiry in order to be itself material matter.

At common law, in an indictment for perjury, it was necessary to aver and show with great particularity wherein the alleged false testimony was material. Section 2039, Revised Statutes 1899, was intended to somewhat simplify the drawing of indictments for this offense. It provides that, "In any indictment for perjury, it shall be sufficient to set forth the substance of

the offense charged, and by what court or before whom the oath was taken, averring such court or person to have competent authority to administer the same, and that the matter or testimony alleged to be false was material to a certain matter or issue named, without setting forth the particular facts showing its materiality, together with the proper averments to falsify the matter wherein the perjury is assigned, without setting forth any part of the record, proceeding or process, or any commission or authority of the court or person before whom the perjury was committed, or the form of the oath or affirmation, or the manner of administering the same.''

Looking to this indictment it will readily be noted that it avers that the December term, 1901, of the circuit court of the city of St. Louis was in session, and the grand jury of the State within and for the body of said city were then and there duly and legally convened and had been duly impaneled, charged and sworn according to law in Division No. 8 of said court, and that there was then and there pending before said grand jury a complaint against one Charles Kratz and one John K. Murrell and other persons for the offense of bribery committed by said Murrell, Kratz, and others in said city of St. Louis, and in the investigation and hearing of said complaint before said grand jury it appeared that said John K. Murrell was a member of the House of Delegates and said Kratz was a member of the City Council and that Philip Stock was employed by the Suburban Railway Company to procure the passage of an ordinance known as Council Bill No. 44, and that on or about November 30, 1900, the said Murrell had gone to said Stock and told him that unless $75,000 should be put up for the use of the House of Delegates, the said ordinance would not be passed, but if said Stock would place said sum with said Murrell said ordinance would pass, and that accordingly said sum was

deposited by Stock in lock box 132 of the safety deposit vaults of the Lincoln Trust Company to await the passage of said ordinance, and that said sum was deposited with the express understanding between said Stock and said Murrell that upon said ordinance being passed by the House of Delegates, and the City Council, and signed by the mayor, said sum of money would be turned over to said Murrell for his own use and benefit, and for the use and benefit of the other members of the House of Delegates whom he claimed to represent—in short, that the grand jury was investigating whether said Murrell and said Kratz were guilty of bribery in agreeing to pass said ordinance No. 44 for the said sum of $75,000 so agreed to be paid by Stock when passed. Thus the cause is named, the court in which the grand jury was impaneled, charged and sworn; the authority of its foreman, W. H. Lee, to administer oaths to the witnesses brought before it; that defendant Faulkner had been duly summoned as a witness before said body and it is then averred ''that then and there it became important and was material to the issue and to the investigation of said complaint by the said grand jury, whether said Faulkner had any knowledge or information of the existence of said sum of seventy-five thousand dollars and of the purpose for which it was to be applied.''

It is urged that defendant's knowledge of the fact was wholly immaterial; that the only material thing was, Did the fact of bribery exist? The distinction thus sought to be made ignores the character of the tribunal before whom the oath was taken and the purpose of its institution in our system of criminal jurisprudence.

Until the adoption of the amendment to section 12 of article 2 of our Constitution, at the general election in 1900, by which it is provided that ''no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment *or information,* which

shall be concurrent remedies," no person could be prosecuted criminally in this State for a felony otherwise than by an indictment preferred by a grand jury, summoned from the body of the county in which the supposed offense was charged to have been committed. It was a safeguard thrown around every citizen, a right that had been handed down to us from our English ancestors.

It was a maxim of the English law, as Blackstone says, that "no man can be convicted of any capital offense (or any felony) unless by the unanimous voice of twenty-four of his equals and neighbors; that is, by twelve at least of the grand jury in the first place assenting to the accusation; and afterwards by the whole petit jury, of twelve more, finding him guilty."

The grand jury are sworn to diligently inquire and true presentment make of all offenses against the laws of the State committed or triable in the county of which they have *or can obtain legal evidence.* [Sec. 2489, R. S. 1899.]

It is their duty to satisfy themselves that sufficient evidence exists for requiring the accused to answer to an indictment before a petit jury. If they think that the accusation is unfounded, they ignore the bill by indorsing thereon, "Not a true bill," and on the other hand, if they consider the evidence sufficient, their foreman indorses the indictment with the words, "A true bill," and signs his name thereto.

Our laws also require that the names of all material witnesses must be indorsed upon the indictment.

At an early period in the history of this State, it was objected that a grand jury had no right to propound to a witness before them the general question, "Do you know of the violation of the criminal laws of this State in the past twelve months?" but that a bill of indictment must first be drawn up charging some particular person with a crime, and the question to the witness limited to the inquiry as to his knowledge of

such person committing that crime. But this court, through Judge McGirk, repudiated that claim. In his opinion in Ward v. The State, 2 Mo. 120, referring to the obligation of the grand jury to diligently inquire, he asks: "And how should they inquire? Not by going into the secret recesses of gamblers and gambling devices, to ask and seek information, but to send for persons who might in their opinion be most likely to give evidence relating to these matters. It is a solemn and important duty, that every citizen owes to his country, to give evidence in courts of justice against offenders against the peace and good order of the community."

It was then the duty and right of the grand jury who were investigating the charge of bribery against Murrell to send for defendant and inquire of him if he had any knowledge or information of the existence of said sum of seventy-five thousand dollars, which it was reported that Murrell had agreed should be paid to him to secure the passage of said bill No. 44. Any knowledge or information possessed by him concerning "the existence of such fund and the purposes for which it was to be used," was material to the inquiry the grand jury was then making. It was the natural and orderly way in which the grand jury would ascertain the material facts upon which to base an indictment or to refuse to find one.

It was their sworn duty to obtain the legal evidence, to ascertain the witnesses by whom the charge could be substantiated and to indorse their names on the indictment, not alone for the benefit of the prosecuting attorney, but for the protection of the person charged in the indictment in the preparation of his defense.

This inquiry and the defendant's answer, taken in connection with the allegations of the indictment, disclose the materiality of the question and answer to the inquiry then being made.

It is not to be expected that any one witness before a grand jury, any more than in the trial of a case in court, will be able to depose to the whole case. As said by SHERWOOD, J., in State v. Day, 100 Mo. loc. cit. 249, "Nor is it necessary in such cases that the false statement tends directly to prove the issue in order to sustain an indictment for perjury. If it be circumstantially material or tends to support and give credit to the witness in respect to the main fact, it is perjury." [State v. Wakefield, 73 Mo. 549, and cases cited; 2 Wharton's Crim. Law, secs. 1277-1282-1301-3-16,1322-1323, and cases cited; Wharton's Crim. Evid. (9 Ed.), sec. 131; 22 Am. and Eng. Ency. of Law, 687, and cases cited.]

That a witness subpoenaed before a grand jury and interrogated as to his knowledge of a crime alleged to have been committed in the county in which the grand jury is lawfully impaneled may commit perjury *by falsely swearing that he did not know of the commission of such crime, or any material fact constituting a link in the chain of evidence necessary to establish such offense,* is now too well settled to admit of a doubt.

In State v. Wakefield, 73 Mo. 549, Judge HENRY, speaking for the whole court, said: "The fact, if true, that Wakefield had received money from Pate to be paid to a police commissioner would constitute a link in the chain of circumstances tending to establish the guilt of such commissioner of the charge the jury was investigating, and if his testimony in every other respect was true, *and only false in this,* he was as guilty as if his testimony was false in every particular." Judge LEWIS, whose opinion in the same case (9 Mo. App. 326) was by this court approved, in discussing the same point, said: "Each fact, although insufficient of itself alone to prove even that a crime has been committed, is yet, because of its relation to other facts in proof, material to the issue on investigation. Were it otherwise, there might be false swearing as to every

link in the necessary chain of evidence, and yet no per-
jury at all.    The law offers no such immunity to those
who would falsely defeat the ends of justice.''

In that case the false testimony was given before
a grand jury investigating whether certain members of
the police board had accepted bribes for giving infor-
mation when raids would or were expected to be made
by the police upon gambling establishments in St.
Louis.

As already said, it had long before that been held
that perjury could be committed by a witness before a
grand jury swearing he did not know of any person
betting upon any game of cards in the county in which
the grand jury was impaneled.   [State v. Terry, 30 Mo.
368.]

This is also the law in other jurisdictions.   In
State v. Offutt, 4 Blackf. (Ind.) 355, the indictment
was for perjury committed before the grand jury.   A
motion to quash was entered on the ground that the law
does not warrant a prosecution for perjury committed
in falsely swearing before a grand jury and the court
held ''there was not the slightest foundation for the
proposition; that the provisions of the statute extend
to false evidence before a grand jury, admits of not
the least doubt.''   To the same effect is State v. Schill,
27 Iowa 263; State v. Turley, 153 Ind. 345; Mackin v.
People, 115 Ill. 312.

But it is unnecessary to pursue this question
further, as our own statute law, section 2506, Revised
Statutes 1899, provides that ''members of the grand
jury may be required by any court to testify whether
the testimony of a witness examined before such jury
is consistent with or different from the evidence given
by such witness before such court; and they may also
be required to disclose the testimony given before them
by any person upon a complaint against such person
*for perjury,* or upon his trial for such offense.''

As pointed out by Judge Brace in State v. Thomas,

99 Mo. l. c. 259, the evil sought to be remedied by this section, was the immunity which witnesses enjoyed from prosecutions for perjury committed before grand juries under the old rule, which was crystallized in section 2508 (sec. 1793, R. S. 1879) which prohibited any grand juror disclosing evidence given before the grand jury, and this last-mentioned section had been construed to prohibit such testimony even under the process of the courts. [Tindle v. Nichols, 20 Mo. 326; Beam v. Link, 27 Mo. 261.]

As to the scope of the inquiry which the grand jury may take in examining a witness in its effort to ferret out crime, it was well said in State v. Schill, 27 Iowa 263: "The grand jury is, by the law, endowed with the power and charged with the duty of inquiring into all indictable offenses committed, or which may be tried within the county. Their duty is to *inquire*. They can not tell in advance of inquiry whether in fact an offense has been committed or who committed it. They can only act upon testimony given under oath by witnesses produced, sworn and examined before them, or upon legal documentary proof. That perjury may be committed by willfully giving false testimony, of a material character, before a grand jury, is evident, and is recognized by the statutes." Necessarily the grand jury has a greater latitude in examining a witness in such inquiry than a party would be allowed in a given case in open court. As said by the court in the Wakefield case, they are at liberty to inquire for evidence, to establish a charge, link by link, and are entitled to true answers.

As said in State v. Turley, 153 Ind. 345, their duty is "to diligently inquire, to obtain legal evidence, to discover and detect crime, and for these purposes have the right to interrogate witnesses concerning all matters which may tend to accomplish that result. It is evident that the grand jury in making the investigation, required by law, may require witnesses to testify con-

cerning matters not admissible on the trial of the cause.
It is true that an indictment should be returned upon
legal evidence, but the grand jury may require wit-
nesses to answer questions tending to show *where and
from whom* they may obtain such evidence.''

In the light of all these rulings it can not be
doubted that if defendant in fact did falsely testify be-
fore the grand jury as charged in the indictment that
he did not know of nor had he ever heard of the exist-
ence of the $75,000 deposited in the Lincoln Trust Com-
pany to bribe certain members of the House of Dele-
gates, when in truth and in fact he did know of the
said money and the purpose for which it was to be used,
he was guilty of perjury.

But it is insisted by the learned counsel that de-
fendant's knowledge of an incriminating fact was
wholly immaterial in the investigation of Murrell's
guilt, and that there is a broad distinction between the
fact of knowledge of and the fact itself of which one
has knowledge. The answer to which is very plain.

The grand jury were charged with the ascertain-
ment of the evidence which would establish the guilt
of Murrell. It was material to know what facts if any
tending to prove the incriminating facts were within
the knowledge of the witness before them. So far as
the witness was concerned, his knowledge of the incrim-
inating facts was all the grand jury were trying to learn
from him, and if he had knowledge of them it was his
sworn duty to impart it, and thus lead the grand jury
to a knowledge of the ultimate fact of which they were
in quest, the fact itself which would show Murrell's
guilt. The incriminating fact in an investigation,
either by the grand jury or a petit jury, could
only be established by the testimony of a witness
or witnesses who had knowledge of its existence.
If he had no knowledge then he could impart
none to the grand jury. If he had it and falsely
testified he had none, then he committed perjury. It

was not not for him to speculate upon the materiality of his knowledge.   For aught he knew he might have been able to furnish the very link which was necessary to enable the grand jury to procure full and satisfactory evidence of Murrell's guilt.   Because, as already said, one witness had deposed to the existence of the fund of $75,000 deposited by Stock and Murrell, the power of the grand jury to further inquire for evidence as to the knowledge of other witnesses was in no manner exhausted, and it does not lie in defendant's mouth to say that the evidence sought from him would have been cumulative.   It not infrequently happens that one witness before the grand jury is either dead or beyond the boundaries of the State when the cause is called for trial, and it was the part of wisdom for the grand jury to obtain all the material evidence available, and not to rely upon Stock's evidence alone.

A jury is not bound to believe or convict any man upon the unsupported testimony of another, and particularly if that other be a *particeps criminis,* and if defendant had knowledge which, as said by Judge SHERWOOD, in State v. Day, 100 Mo. 249, was "circumstantially material or tended to support and give credit" to the other evidence adduced in the investigation and falsely swore he did not know of such fact, he committed perjury.   The indictment is not open to the charge of immateriality.

Counsel are not altogether agreed as to the insufficiency of the indictment.

On the one hand it is urged that the pleader has failed to allege a good charge of perjury because he has not also included a good technical charge of bribery of Murrell by Stock, and that it has failed to charge the one material inquiry open to the grand jury, to-wit, the agreement between Stock and Murrell as to the official action or vote of the latter, and that unless defendant was possessed of knowledge of the agreement between Stock and Murrell that Murrell should act corruptly,

there was nothing material to which appellant could testify. On the other hand, another of the counsel insists that it would have been sufficient to have alleged simply that a charge of bribery was pending before the grand jury against Murrell and that it became material to inquire whether $75,000 had been placed in the Lincoln Trust Company's vaults in connection with said bribery, and that defendant upon his oath falsely swore that he did not know of nor had he heard of the existence of the said $75,000 deposited in the Lincoln Trust Company for the purpose of influencing or bribing or corrupting any member of the House of Delegates for his vote or influence in the passage of said ordinance, without alleging all the particulars necessary to make a good indictment for bribery also. We are inclined to take this latter view, but for reasons already said, we do not agree that the indictment is repugnant for the reason that the knowledge of defendant was immaterial, because it had been alleged that it had been "developed" that in pursuance of an agreement between Stock and Murrell, $75,000 had been deposited in the trust company.

It was material for the grand jury to obtain all the competent evidence necessary to convict Murrell of said bribery, and the mere fact that one or even two witnesses had so testified before the grand jury did not deprive the grand jury of its jurisdiction to obtain other material evidence to establish that charge should they indict Murrell, nor render Faulkner's knowledge of that fact immaterial. It was his knowledge which would have made him a material witness, if any such he had.

## II.

Again, objection is made that the indictment is repugnant in its allegations because the pleader had averred that it had been "developed" before the grand jury that the $75,000 had been deposited, and that it became material to the issue of Murrell's guilt to as-

certain that appellant had knowledge of said $75,000, and *the purposes for which it was to be used*.    The contention is that because it was alleged that it had been *"developed"* that the $75,000 had been deposited by Murrell and Stock, that fact ceased to be an issue before the grand jury.    In a word, that because some witness had disclosed the fact of the deposit of the $75,-000 by Stock and Murrell, the grand jury were bound to stop their investigation and make no further endeavor to obtain evidence which would corroborate and strengthen that which they already had, and while averring it was material, that fact shows it was not.    On the contrary, it was the plain duty of the grand jury to sift the matter thoroughly and procure *all* the *material* evidence they could to substantiate the charge and peculiarly was it incumbent on them to do so because the State was bound to establish the guilt of Murrell beyond a reasonable doubt.

."Developed" does not signify that the fact of the bribery was so fully determined that it would not take testimony to establish it before a petit jury.    On the contrary the word itself in the connection in which it is used, signifies an unfolding of the crime.

## III.

The court on application therefor by the State made an order for a special jury to try the case.    The regular jury commissioner thereupon selected the list from the general register of jurors in the city, and did not draw them from the wheel in the manner of ordinary juries, and of this defendant complains on the ground that in every part of the State all kinds of juries, grand, petit, special and ordinary, are required to be drawn by lot, and thus citizens of St. Louis are denied a right secured to citizens of all other portions of the State, to-wit, the right to have their juries selected by chance.

As to *special* juries counsel have overlooked the

statute which governs all parts of the State, including St. Louis, and provides that "either party to a cause pending in the circuit court or court of common pleas or the criminal court of any county or city and triable by a jury, shall be entitled as of course to an order for a special venire on motion made therefor three days before that on which the case is set for . trial. . . . This section shall apply to cities having over three hundred thousand inhabitants as fully as to all other parts of the State." The law governing special juries, therefore, is not special and makes no invidious distinction in the case of St. Louis. There is no conflict between sections 3791 and 6566, Revised Statutes 1899. The first secures this right to any litigant in any circuit or criminal court in the State, and section 6566 merely provides the machinery in cities having more than one hundred thousand inhabitants. In those cities having a jury commissioner it is made his duty, as he may be directed by the court, to select the names of persons for the special jury, and furnish them to the sheriff or other officer to summon them. But as pointed out by this court in State ex rel. v. Withrow, 133 Mo. 500, a special jury is not a jury drawn by chance from a wheel, but is one selected by the proper officer in the exercise of judgment and discretion, and the defendant established by his evidence on the motion to quash the venire that the jury commissioner did select men for this and other special juries because of their good citizenship and did not draw them by chance from the wheel. It is clear that the jury commissioner did not mistake the ruling of this court in the Withrow case. This court in State v. Leabo, 89 Mo. 247, held that if the motion for a special venire is made three days before the day set for trial, the court has no discretion, and it would constitute error, to deny the special venire. We can add nothing to what was said in State ex rel. v. Withrow, 133 Mo. 500, either as to the proper method of selecting special juries or the constitutionality of it.

We can discover no infringement of our Constitution in either provision cited.

## IV.

Much is said in the briefs of defendant in regard to the failure to serve defendant's counsel with a copy of the panel of the special venire.

From the argument made it would seem that counsel claim that they were entitled to at least twenty-four hours' inspection of the panel before being required to proceed with the examination of jurors on their *voir dire*.

We do not think this a proper construction of our statute governing this case. Section 2623, Revised Statutes 1899, provides that a list of jurors who have been found by the court to be qualified to sit as such in his case shall be delivered to the defendant in the cases specified in the first subdivision of section 2619 at least twenty-four hours before the trial, that is to say, in cases in which "the offense charged is punishable with death, or by imprisonment in the penitentiary not less than for life;" and in the cases specified in the second subdivision of said section, at least twelve hours before the trial, that is, if the offense be punishable in the penitentiary not less than a specified number of years and no limit to the duration of such imprisonment is declared. "In other cases, before the jury is sworn, if such list be required."

In this case the punishment prescribed is not exceeding seven years and not less than two years, so that it falls within the clause which prescribes that defendant shall have a list of the panel before the jury is sworn if he requires it. Reading section 2623 in connection with section 6566, it will be seen there is no conflict between the two. The latter provides that a list shall be made out and delivered to each party, and the former designates the time which shall be given the de-

fendant before he shall be required to make his challenges.

We have carefully read the evidence on this point, and the finding of the court. The first order for a special venire was for fifty jurors and was returnable on the 17th of July. The jury commissioner made out five lists of the panel and handed them to the court who gave them to the sheriff to serve and kept the others until the 17th. On Thursday morning, the 17th, the judge handed three of the lists to the clerk, who handed one to the counsel for the State and another to counsel for defendant. The jury was not called until the lists had been handed to the respective counsel.

On Thursday, it appears, counsel for defendant insisted on the full number of jurors being summoned, and thereupon the court ordered the jury commissioner to select fifty more jurors returnable July 21, 1902.

The counsel were served with copies by the clerk on the 21st, just as they had been on the 17th. Counsel for defendant made the point that the sheriff must deliver the lists, but the court overruled his contention, and he duly excepted.

On the 21st the first twelve was called to the jury box to be examined on their *voir dire* and were examined by both sides, and found competent, and at this point the court adjourned until Tuesday, July 22, 1902, at ten o'clock, and the whole venire were duly cautioned as to their duties and obligations.

On the reconvening of court on Tuesday, counsel stated to the court that the sheriff on the preceding day had been calling from the panel ordered on Thursday, and not from the first fifty, and they therefore moved the court *to complete* the list from the first list, which motion the court overruled. The sheriff called the list which he used in its regular order. When counsel for defendant required a hundred jurors to be summoned before proceeding with the examination of the

Vol 175 mo—37

jurors the additional fifty became as much a part of the list as those first summoned. The court's attention was not called to the fact that the sheriff was calling the list that was returned on the 21st of July until twelve jurors had qualified. At that point defendant insisted on changing the order and on calling the first list from that time on. It is not asserted that there was any difference in the character of the jurors on the second list of fifty and those on the first, or that they would have been more favorable to defendant. The whole number had been summoned from which to obtain a panel of qualified jurors. It is not even suggested that any member of the panel of twenty-four jurors found competent was for any reason incompetent.

The statute providing for summoning jurors has been so often held to be merely directory that it is scarcely necessary to cite decisions. [State v. Jennings, 98 Mo. 493, and cases cited; State v. Williams, 136 Mo. 307; State v. Albright, 144 Mo. 638; State v. May, 172 Mo. 630.]

Counsel had the lists and it was not necessary that they should have been served on them by the sheriff. In a somewhat extended practice we have never known the list to be furnished counsel by any one but the clerk.

Had counsel been attentive to their written lists they could have ascertained that the sheriff was calling the second list and it was their duty to object during the first day's examination of the jurors on their *voir dire*. Having permitted twelve of that list to qualify they had no absolute right then to turn to another list. Under all the circumstances it was a matter within the wise discretion of the court, and it is apparent no harm has resulted as there is no objection in the record to any individual juror on the panel finally selected, from which the jury was chosen to try this case.

## V.

We are thus brought to the errors assigned on the admission of evidence. This can best be disposed of in groups.

The first objection is general, to-wit, to all that evidence which went to establish the averments in the indictments that Murrell was actually bribed by Stock to pass the Suburban bill or Council Bill No. 44, on the ground that it was entirely immaterial; that the true and only issue in the case was whether defendant "knew of the existence of the seventy-five thousand dollars deposited in the Lincoln Trust Company for the purpose of influencing or bribing any member of the House of Delegates;" that whether the charge of bribery against Murrell was true or false, and whether the charge that the money had been deposited was true or false, if the same was being investigated by the grand jury and defendant was a witness before said grand jury and falsely, knowingly and corruptly testified to any matter material to said inquiry, he was guilty of perjury, whether Murrell was guilty or innocent.

We think this is a fair statement of defendant's position on this general mass of evidence which tended to show Murrell was in fact guilty of the bribery which was under investigation by the grand jury, and we think, moreover, that after the State had established that the circuit court was in lawful session and that a grand jury had been impaneled, charged and sworn therein and William H. Lee had been duly appointed foreman thereof by the court, and that defendant was summoned before said grand jury and sworn to testify the truth, the whole truth and nothing but the truth in answer to any question that might be propounded to him, and a member or members of the grand jury had testified that at that time a charge of bribery against Murrell was being investigated by said jury in which it was asserted that $75,000 had been deposited in the

Lincoln Trust Company by Stock and Murrell under an express agreement between Stock and Murrell that if said ordinance 44 was passed by the House of Delegates and the City Council and signed by the mayor, the said sum would be turned over to the said Murrell for his own use and benefit and for the benefit of other members of the House of Delegates he claimed to represent, and that in the course of said investigation defendant was asked touching his knowledge of the deposit of said $75,000 for the purpose of bribing said Murrell, and other members of said House of Delegates, and that he swore he had no knowledge thereof, then the pertinent and material issue was to prove the falsity of his evidence.   To establish this the testimony of Paul Reiss as to conversations had by him with defendant tending to prove that defendant had a conversation with him while walking west on Olive street in St. Louis sometime in December, 1901, in which defendant told him that he understood that a brewer named Stock held a key to a box in the Lincoln Trust Co., and that "the boys" interested in the proposition were a desperate lot, and unless the matter was fixed up, they would make trouble and otherwise indicated a knowledge of said fund of $75,000 and the purpose to use it to bribe certain members of the House of Delegates, was material and competent.

To this extent we think no serious objection is urged to the testimony, but when the State undertook to make the further necessary proof required in all prosecutions of perjury, to-wit, to corroborate Reiss by producing corroborative evidence, it offered evidence tending to prove that Stock was the representative of the Suburban railroad and that Murrell had approached him and made propositions to secure the passage of Bill No. 44 of the Suburban ordinance for $75,-000; that in pursuance of these negotiations the $75,-000 was in fact deposited in the Lincoln Trust Company under the express agreement between Stock and Mur-

rell that when the ordinance had been passed by both houses of the Municipal Assembly and signed by the mayor, said sum would be turned over to Murrell.

There was also proof of the pendency of the bill in the House of Delegates and then evidence was offered to show that a combine or confederation consisting of a majority of the House of Delegates existed and that defendant was a member of that combine. To all of this evidence defendant, as already said, objected: first, because it was irrelevant and immaterial to the issue on trial; and, second, because it had not first been shown that the so-called combine was for a corrupt purpose, and that notwithstanding the evidence tended to show Murrell's guilt, it did not and had not connected defendant with the corrupt agreement of Stock and Murrell; that as to him at least it was *pure hearsay*. Bearing in mind, now, that the grand jury was investigating the charge of bribery against Murrell and the discovery of the $75,000 in the safe deposit box on a charge of perjury against defendant for falsely swearing he knew nothing of said $75,000, the fact of bribery was pertinent, as it was the necessary predicate of his alleged knowledge, but its pertinency and materiality, so far as defendant was and is concerned, depended on his knowledge thereof. Unless his knowledge was shown by evidence sufficiently corroborative of that of Reiss, no conviction could be had. In Greenleaf on Evidence it is laid down: "In proof of the crime of perjury also it was formerly held that two witnesses were necessary because otherwise there would be nothing more than the oath of one man against another, upon which the jury could not safely convict." [1 Greenleaf, Ev., sec. 257.] This court in State v. Heed, 57 Mo. 254, adopted his language as its own, as to the relaxation of that rule, as follows: "But this strictness has long since been relaxed; the true principle of the rule being merely this, that the evidence must be something more than sufficient to counterbalance the oath of the prisoner and

the legal presumption of his innocence. The oath of the opposing witness, therefore, will not avail unless it be corroborated by other independent circumstances. But it is not precisely accurate to say that these additional circumstances must be tantamount to another witness. . . . The additional evidence need not be such as, standing by itself, would justify conviction in a case where the testimony of a single witness would suffice for that purpose; but it must be at least strongly corroborative of the testimony of the accusing witness; or in the quaint, but energetic, language of PARKER, C. J., 'a strong and clear evidence, and more numerous than the evidence given for the defendant.' '' [State v. Mooney, 65 Mo. 494; State v. Reeves, 97 Mo. 668.]

So that while the evidence of the deposit of the $75,-000 and the corrupt purposes for which it was raised and placed in the safety box was competent, because this was the very fact the grand jury were investigating, and if it had not existed the alleged falsity of defendant's evidence was without any basis whatever, the State was bound to prove by evidence in addition to that of Reiss and corroborative thereof, that defendant knew of such fund and its criminal purpose. To do this the State offered and the court admitted over the objection of defendant evidence tending to prove that defendant was a member of what was termed ''the combine'' in the House of Delegates. If the State had shown that this combine was for a corrupt purpose, and that a conspiracy had been entered into to pass this ordinance, then of course, what Murrell said and did in the furtherance of said conspiracy would bind this defendant if he was shown to have been a member of such conspiracy.

But here we are confronted with the insistence that there was no proof of a combination for corrupt or unlawful purposes. The evidence established that defendant was a member of the House of Delegates, one

branch of the Municipal Assembly, and that Murrell was also a member of the same house; that nineteen members of that body ordinarily voted together on various matters and ordinances under consideration by that body; that these nineteen men were denominated "the combine" by the city press, and by their fellow-members; that they were in the habit of meeting in a room adjoining the chamber in which the House of Delegates met and that being a majority they could and did largely control the legislation of that body, but the evidence did not show that the Suburban bill or Council bill No. 44 was ever discussed by said nineteen at any time, or that defendant was ever present when such discussion, if any, took place, or that the question of their obtaining $75,000, or any other sum, was ever considered by them when defendant was present, or at any other time. It is conceded by the learned counsel for the State that the mere fact that defendant was a member of the House of Delegates was not evidence tending to prove that defendant knew that Murrell had bargained to receive $75,000 for the passage of said Council bill No. 44, or the Suburban ordinance, but their insistence is that the fact that he was a member of or generally voted with the nineteen is evidence that he knew of Murrell's corrupt agreement.

It is not pretended that Murrell ever named the defendant as one of the members of the House of Delegates who was to receive a part of the $75,000, but if he had it is obvious such a declaration on Murrell's part would not be binding on defendant unless there was proof that defendant was a member of a conspiracy to demand said money as the price of the passage of said bill or ordinance. Counsel cite us to the case of People v. O'Neil, 109 N. Y. 251, but in that case two of the aldermen testified to the forming of the illegal combination for controlling the grant of a franchise on Broadway; that thirteen of the aldermen constituting a majority of the board met and discussed two prop-

ositions that were made to them and one of them urged that they should accept the offer of surface railroad, viz., $500,000 in cash. The report of that case (page 255) then states:

"After some discussion upon the subject by the various members present, all present, *of whom defendant* was one, voted to accept the proposition of surface company and each should receive $22,000 for his vote. They afterwards met and appointed the man to receive the money."

In that case the unlawful conspiracy was established, and the participation of the defendant therein, and the court ruled that what the different aldermen afterwards did in pursuance of this corrupt agreement was evidence against the defendant, who was a party to it, and also that the acts and proceedings of the board in which the defendant participated were competent as throwing light on the prior conduct of defendant and to corroborate the testimony of the accomplices. No doubt whatever is entertained that that decision was correct. But in this case no combination other than to control the organization of the House of Delegates was established. No witness testified to any such corrupt agreement and combination as was shown in the O'Neil case, supra.

We have read the evidence with great care, and so far as Stock's evidence as to Murrell's statement to him goes, it included all of the House of Delegates. Murrell did not assume to represent nineteen only of the members, and did not specify those whom he assumed to represent by name. He never saw defendant in connection with the deposit and never told him of it.

When we come to the character of this combine and the purposes for which it was organized, it appears that Holtcamp, himself a delegate in the House, testified there was an organization in the House commonly called "a combine." He would not say it was organized particularly to control Suburban legislation, but they practically controlled all legislation; that

there were nineteen members of it. When interrogated as to their meeting place, he answered that he saw some of their meetings in a retiring room adjoining the House. Asked if other members not in the alleged combine went into that room, he said he could only speak for himself. He happened in there once or twice—nothing particular was said while he was in there. This witness named defendant as one of the nineteen.

Asked if he ever saw this defendant come out of the room where the combine met, he said he had no recollection of ever having seen him do so. He could only say he was a member by his counseling and voting with the nineteen. Defendant had never talked with him about the matter. On cross-examination he stated he could not say that defendant was ever present in the private room on any given occasion. In the first organization of the House defendant co-operated with witness in the election of Tamblyn as speaker, and then after a reorganization ousting Tamblyn, defendant went with the combine whom he had up to that time opposed.

Witness stated that this organization or combine went to pieces because some of them would not agree to vote as a unit on bills.

Asked the purpose of this organization witness answered, nothing ''beyond the fact that all were expected to vote together on bills.'' There was no agreement or suggestion at any time to do any unlawful or corrupt act. He knew of nothing that defendant did beyond voting and counseling with the nineteen after the reorganization.

Mr. Sturdevant, another delegate, testified substantially as Holtcamp did, but would not say he ever saw defendant come out of the room when the combine met during the consideration of the Suburban bill. He knew nothing of any meeting of defendant with the combine for the purpose of influencing legislation upon the Suburban bill.

Mr. Parker, likewise a member, testified that defendant was regarded as a member of the combine, but could not state that defendant ever attended one of their meetings when the Suburban bill was before the House, or participated with them in connection with it. This witness testified he was in the organization that controlled the House while Tamblyn was speaker. He would not say that Faulkner always voted with the combine. Occasionally the witness himself voted as defendant did. The witness's combine was only for legitimate business, to further the general welfare of the city, and each member's ward. Reiss testified that the organization at one time was for the purpose of having officers friendly to the mayor so far as appropriate legislation was concerned.

In view of this evidence it is insisted by the State that the inference is *irresistible* that this combine of nineteen were to receive the $75,000, and as defendant was shown to be one of them he necessarily knew of the corrupt fund and its purpose, and therefore this evidence was sufficient corroboratory proof to overbalance the evidence of defendant before the grand jury that he did not know of the $75,000 bribery fund. After a careful consideration of it we are unable to adopt such a view. This is a criminal prosecution for a felony. The law presumes the defendant innocent until his guilt is established beyond a reasonable doubt. We agree that his guilt may be established by circumstantial evidence, but these circumstances must be consistent with defendant's guilt and be inconsistent with his innocence. Now, while this evidence tended to prove defendant was a member of "a combine" in the House of Delegates, or an agreement of certain members to vote together, there is not a word anywhere in it that shows the conspiracy was for the corrupt purpose of accepting bribes to further legislation. The witnesses who testified to defendant's being in the combine admitted they were also in similar combines to maintain a certain

organization of the House as against a rival faction and that defendant was in their combine, but they one and all scouted the suggestion that thereby they were bound together for any illegal or immoral or corrupt purpose. While partisanship very often leads men to an unreasonable support of both men and measures, it is going entirely too far to say that because men go into conventions and caucuses and thereby bind themselves to abide their conclusions, they thereby commit themselves to every illegal and corrupt act which some member of that caucus or convention may commit, and that they should be held to have a guilty knowledge of such illegal and corrupt act.

So in this case while it is a legitimate inference from the testimony that the nineteen members of the House did have an organization binding them to vote together on all questions and that by so doing they disregarded that duty to the city and their constituents which every representative owes to carefully consider each measure brought before him and vote upon it as his own independent judgment dictates and solely upon its merits, it is not therefore to be presumed that it was a combination for bribery or other corrupt purpose and that because one of their number is shown to have accepted a bribe that it is an *irresistible* or even a reasonable inference or presumption that all the others knew of the bribe and were to participate in its fruits. Much as such combines are to be condemned, the mere fact of their existence does not justify the presumption that they are necessarily for corrupt purposes.

It is entirely within reason to conceive of a number of persons agreeing to do an act not criminal in itself, and that one of their number should afterwards do or agree to do a corrupt act entirely distinct from that which they had agreed to do, and if he does so the others not consenting thereto are not responsible for his independent criminal conduct, and this is true even if the agreement was to do one character of criminal act, and

he should do a different one.   Thus, Hawkins in his Pleas of the Crown, long ago laid it down that: "If a man command another to commit a felony on a particular person or thing, and he do it on another; as, to kill A, he kills B; or burn the house of A and he burn the house of B; or to steal an ox, and he steal a horse; . . .   or to commit a felony of one kind, and he commit another of quite a different nature; as to rob J. S. of his plate as he is going to market, and he break open his house in the night and there steal the plate; it is said, the commander is not an accessory, because the act done varies in substance from that which was commanded."   [2 Hawkins, P. C. (Curr. Ed.), ch. 29, sec. 21-22.]

So that if the evidence has shown a conspiracy to extort a bribe as the price of the passage of the ordinance known as the Suburban bill and that defendant was a member of that conspiracy, the subsequent conduct of Murrell during the continuance of such conspiracy in arranging for the delivery of the bribe would have been binding on defendant and Murrell's act would have been his act, and the fact that he was a member of such a conspiracy would have been strong corroborative evidence of his knowledge of the bribe money and the purposes for which it was to be used.   Such was the case in People v. O'Neil, 109 N. Y. 251, but when the State merely showed in this case that he was a member of the combine who controlled legislation in the House of Delegates and failed to show by any witness or evidence *aliunde* that the purpose of said combine extended to the corrupt purpose of extorting bribes to secure the passage of bills and particularly the Suburban bill, it fell short of showing a conspiracy that would render defendant liable or responsible for Murrell's corrupt act, and necessarily failed to show such knowledge of his corrupt bargain with Stock as would convict him of perjury in testifying that he did not know of the $75,-

000 and the purpose for which it was to be used.

In our opinion, the bare fact that defendant was a member of the so-called combine in the House of Delegates without having shown that the purposes of said combine was to extort or obtain a bribe to pass the Suburban bill, was insufficient by itself to show knowledge on the part of defendant of the $75,000 and the corrupt purpose for which it was to be used, and when the court subsequently instructed the jury in its fourth instruction that the mere fact that defendant was a member of the House of Delegates was of itself no evidence that defendant knew that the $75,000 was deposited by Stock and Murrell, the jury might well have concluded that the mere fact that he was a member of the combine without the further proof that it was formed and existed for the corrupt purpose of extorting or receiving bribes was sufficient corroboratory evidence of such knowledge and corroborated Paul Reiss, the accusing witness. The State should have been required to go further and show that this combination was for the corrupt and illegal purpose of obtaining a bribe to pass the Suburban ordinance, and that defendant was a member thereof with knowledge of its purposes.

In the absence of such additional proof, the defendant was not bound by any statement by Murrell or Stock made in his absence and without his assent to the effect that the $75,000 was deposited under an agreement to procure the passage of the ordinance No. 44, through the House of Delegates.

## VI.

Considering now the specific objections of defendant to certain testimony, we note first the assignment that the court erred in permitting Paul Reiss to testify to a conversation had with him by one Julius Lehman in May, 1901, regarding the $75,000, because it was the statement of a third person in no manner authorized

to speak for or bind defendant, and in his absence, and, secondly, because it was a privileged communication of Lehman to his attorney.

The admission of Lehman's statement to Reiss came about in this manner: Reiss had testified to defendant's statements to him in regard to the $75,000 on two different occasions, and to his statement to defendant that he (Reiss) had heard the story, but that knowing Stock as he did he discredited Stock's doing such a thing.

On redirect examination the prosecuting attorney asked the following question: "You have stated that when this deposit in the Lincoln Trust Company was referred to, you said you had heard the story; now, I ask you how and from whom you heard it, if any one?"

To this question counsel for defendant interposed the objections that it was pure hearsay, and could in no way affect defendant, and moreover, was a privileged communication. The argument on the part of the State was, that as counsel for the defendant had asked Reiss in regard to his statement to defendant, "Did you tell him how you became familiar with the story?" and Reiss had answered, "I don't know that I did," this was an insinuation that the witness had received his information from Stock, and for that reason the State proposed to show now from whom he did receive his information, to-wit, from Lehman, a member of the House of Delegates, a member when defendant was, and a member of the combine. Counsel for defendant insisted that no such insinuation was made; that the sole purpose of their question was to show he didn't get it from defendant. The prosecuting attorney, however, insisted it was also competent to show that Lehman, a member of the combine, had gone to Reiss and tried to get him to effect a compromise with Stock in behalf of the combine, and to show the purpose of the combine was not merely to control legislation, but for the purpose of receiving money for votes, an illegal

purpose. As to the first proposition we are clear that no foundation was laid for it in the cross-examination of Reiss. He was not asked from whom he received the information which he told defendant he had heard and discredited.

As defendant had not invoked this hearsay, it was obviously incompetent and highly prejudicial to allow the State to introduce it on the claim that Reiss was entitled to tell from whom he had heard it. He had already detailed at length all that defendant had told him and beyond all cavil it was contrary to elementary principles and improper to permit him to tell the jury what some one else had told him in the absence of defendant. The defendant could not be bound by what Lehman in his absence and without defendant consenting thereto had told Reiss some six months previously. As to Lehman being a member of the combine, the same reason exists for excluding his statement to Reiss so far as the defendant is concerned as we have held existed against Murrell's statements until it had first been established that this defendant was a member of a *corrupt* conspiracy with said Lehman and others to extort a bribe for the enactment of this bill or ordinance. Lehman's statement, so far as this defendant was concerned, was pure hearsay and inadmissible, and in no way binding on defendant, and the circuit court erred in admitting it over the protest of defendant.

We are referred by counsel for the State to State v. Walker, 98 Mo. 95, and State v. Melrose, 98 Mo. 594, but those cases merely announce the familiar rule that the time when the proof of the conspiracy must be offered is somewhat in the discretion of the court, but the doctrine is reaffirmed in those cases, as it is everywhere else, that "it is necessary to show a combination or conspiracy in order to make the acts and declarations of one the acts and declarations of all," and while it is sometimes permissible, on the undertaking of the

prosecuting officer that he will later on show the conspiracy, to permit declarations and acts of one, made and done in the absence of the others, before the conspiracy is fully proved, the rule is everywhere qualified with the proviso that *"the proof shall afterwards be made."*

As already said, no other proof in this record supplied this failure to prove the criminal conspiracy *aliunde* so as to render Lehman's statements admissible against this defendant.

If the prior criminal combination had been shown, his statement, if otherwise competent, would have been competent in chief and not at all dependent upon the cross-examination of Reiss, or if sufficient evidence of the criminal purposes of the combination had been shown to justify the court in submitting the question to the jury, it would have been competent for the jury to find the purpose of the combine to have been to exact bribes, but after a careful consideration we are of opinion that the mere fact that the defendant was one of the controlling faction in the house and usually voted with them does not create a presumption that the said organization had with his knowledge combined to commit bribery or receive bribes for their votes nor is there any presumption that because Murrell bargained for the bribe, all the others or this defendant knew it or should be presumed to know it. We may have a suspicion that such was the case but the defendant was on trial for his liberty, and we can not indulge in suspicions in a matter so grave and so far-reaching in its ultimate effect in the administration of the criminal law. We think, moreover, the court should have gone farther than it did and not merely instructed the jury that the fact that defendant was a member of the House of Delegates was no evidence of his knowledge of the $75,000 deposited by Murrell and Stock, but that the fact that he was one of the majority who ordinarily

voted together was by itself no evidence of his knowledge of said bribe.

## VII.

But again, it is insisted that Lehman's statement to Reiss was a privileged communication by a client to his attorney. To which contention the State answers, it was not privileged, because Lehman was attempting to have Reiss *further the crime* of bribery, and become accessory after the fact to that crime. The defendant replies that it is only those communications made by the client to his attorney before the commission of the crime for the purpose of being guided and helped in the commission of it, that are not privileged and that in this case the crime was complete, to-wit, the criminal agreement to vote for the passage of the Suburban bill before Lehman consulted Reiss and the conspiracy ended. The evidence of Reiss was that Lehman attempted to get Reiss to undertake to bring about a settlement for the seventy-five thousand dollars or part of it, which Stock had deposited in the Lincoln Trust Company for "the boys," himself among the number. In a word, it was an effort to employ Reiss to secure the fruits of a promised bribe which had not yet been realized. The general rule, both in England and in the United States, is well summed up in Chrisler v. Garland, 11 S. & M. 136, as follows: "Communications from clients to attorneys are privileged on the ground of public policy, with a view to the safe and pure administration of justice. The protection is not qualified by any reference to proceedings pending or in contemplation. It is adopted out of regard to the interests of justice, and from the necessity of free and unrestrained intercourse between counsel and client. It is better, in our judgment, to adhere to the rule, in a broad and liberal sense, than to weaken its force by exceptions." This is a fair

Vol 175 mo—38

statement of the law in civil cases, and also in regard to communications made by a client to his attorney in the defense of a criminal prosecution, but there is an exception as broad as the rule itself, to-wit, communications made by a client to an attorney *before* the commission of a crime and for the purpose of being guided or helped in its commission are not privileged. In Queen v. Cox, 14 L. R. Q. B. D. 153, all the English decisions on this question received the most careful consideration of the ten judges of the High Court of Justice, and the opinion was delivered by Mr. Justice STEPHEN, with the full concurrence of all the justices. The three rules deduced and affirmed from these authorities are tersely stated by Judge HURT, in Orman v. The State, 22 Texas Court of Appeals 604, loc. cit. 616:

"*First.* To be privileged the communications must pass between the client and his attorney in professional confidence and in the legitimate course of professional employment of the attorney.

"*Second.* If the communications are by the client made to the attorney before the commission of the crime, and for the purpose of being guided or helped in its commission, they are not privileged.

"*Third.* Nor does the fact that the attorney was wholly without blame in any particular whatever affect the second rule."

Measuring the communication made by Lehman to Reiss by this first rule, it is entirely plain that Lehman was not consulting Reiss for the purpose of defending him against a pending or anticipated prosecution for the bribery disclosed. Was it a communication by a client to his attorney in professional confidence "in the legitimate course of professional employment of the attorney?"

Section 4659, Revised Statutes 1899, which renders an attorney incompetent to testify "concerning any communication made to him by his client in that rela-

tion, or his advice thereon, without the consent of such client," is merely declaratory of the common law, and in no manner affects the exceptions to the general rule excluding such communications. This court has ruled that the rule does not extend to nor shelter advice concerning or assistance in *proposed infractions* of the law. [Hickman v. Green, 123 Mo. loc. cit. 188.]

Lord Brougham's statement of the rule at common law, in Greenough v. Gaskell, 1 M. & K. 101, is generally accepted: "If, touching matters that come within the ordinary scope of professional employment, they receive a communication in their professional capacity, either from a client, or on his account, and for his benefit in the transaction of his business, or, which amounts to the same thing, if they commit to paper, in the course of their employment on his behalf, matters which they know only through their professional relation to the client, they are not only justified in withholding such matters, but bound to withhold them, and will not be compelled to disclose the information or produce the paper in any court of law or equity, either as a party or a witness." This is accepted by Greenleaf as the correct statement of the rule. [1 Greenleaf, sec. 237.]

But, as said by Judge Stephen, it has no reference to communications by a client to his attorney in furtherance of a crime or fraud.

The reason on which the rule rests, is that "it is out of regard to the interests of justice, which can not be upholden, and the administration of justice which can not go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings." But, as said by the same learned judge in Queen v. Cox, 14 L. R. Q. B. D. loc. cit. 167, "the reason on which the rule is said to rest can not include the case of communications, criminal in themselves, or intended to further any criminal pur-

pose, for the protection of such communications can not possibly be otherwise than injurious to the interests of justice, and to those of the administration of justice. Nor do such communications fall within the terms of the rule. *A communication in furtherance of a criminal purpose does not 'come into the ordinary scope of professional employment.'* "

The eminent judge then remarks that Lord BROUGHAM did not have the exception as to communications *criminal in themselves,* or intended to further any criminal purpose before him, or he would have noted them as exceptions, but remarks that the caution with which he worded the principle has the same effect.

Proceeding in the examination of the point under consideration, he comments upon Gartside v. Outram, 26 L. J. (Ch.) 113, decided by Lord HATHERLY, then Sir W. Page Wood. In that case certain wool-brokers sought to restrain a man who had been their sale clerk from disclosing their transactions. He replied they were fraudulent. The vice-chancellor said: "Confidential communications involving fraud are not privileged from disclosure. . . . The true doctrine is, that there is no confidence as to the disclosure of iniquity. You can not make me the confident of a crime or a fraud, and be entitled to close up my lips upon a secret which you have the audacity to disclose to me relating to any fraudulent intention on your part; such a confidence can not exist," and quotes as his own, this language of Sergeant TISDAL: "If he is employed as an attorney in any unlawful or wicked act, his duty to the public obliges him to disclose it; no private obligation can dispense with the universal one which lies on every member of society to discover every design which may be formed, contrary to the laws of society, to destroy the public welfare." To the same effect is Regina v. Orton, COCKBURN, C. J., Shorthand Notes, vol. 3, p. 9381.

Applying the foregoing principles to the case in hand, we may confidently assert by way of exclusion: First. Lehman had not and was not endeavoring to employ Reiss to defend him against a pending or anticipated prosecution for bribery. Second. This communication was not made by Lehman to Reiss *before the* commission of the bribery and for the purpose of being guided or helped in its commission, because at that time the bribery was complete, since according to Reiss, Lehman and his associates had, under an agreement with Stock, already agreed to give their votes for the passage of the Suburban bill, in consideration of the promise of the $75,000 deposited in the trust company, and were just as guilty as if each of them had received his pro rata share thereof. Third. If the communication was not privileged it must be because it did not come within the protection of the rule itself which renders a communication between attorney and client privileged only when made between them *in professional confidence* and in the legitimate course of professional employment of the attorney.

In a most admirable discussion of this question by Judge ELLISON in Hamil & Co. v. England, 50 Mo. App. 338 (Kansas City Court of Appeals), it is said that there is now no substantial disagreement of what the rule is, but the difficulty is in the application of the terms "ordinary scope of professional employment" and "professional capacity." The rule does not exclude all that passes between client and attorney, but that only which passes between them in *professional confidence.*

So that so far as this particular case is concerned, the admissibility of the testimony of Reiss depends upon whether Lehman's statement to him of the deposit of $75,000 for "the boys," alias certain members of the House of Delegates, including himself, and seeking Reiss's assistance in adjusting a compromise, so that he and his associates could get their bribe, can be

said to fall within the ordinary scope of the professional employment of attorneys at law.

Everywhere the English and American courts have, in true professional pride, pronounced that it is no part of an attorney's employment to advise or hold professional communications as to the manner of committing a felony or fraud, nor to devise means to avoid the punishment which such conduct justly merits. As said by Mr. Justice STEPHEN, with the concurrence of all the English Judges, in Queen v. Cox, 14 L. R. Q. B. D. 153, "if his criminal object is avowed, the client does not consult his adviser professionally, because it can not be the solicitor's business to further any criminal object."

Conceding that the crime of bribery was complete, so far as the criminal agreement to pass the ordinance in consideration of the $75,000 was concerned, it is plain that the proposition of Lehman to Reiss was to aid in obtaining the promised bribe which was being withheld by Stock, and was no less iniquitous and degrading so far as the attorney was concerned, than if his aid had been sought in the first instance. Lehman knew and was bound to know, and Reiss the attorney knew, that Lehman's claim against Stock or the Suburban company was one which no attorney could enforce in any court. No judicial tribunal would have listened to such a proposition for an instant, and the attorney advancing it would have deserved disbarment.

It was a bald offer to divide the fruits of crime with the attorney, if the latter could secure them. Lehman seems to have fully appreciated this, because he only asked Reiss to bring about a compromise with Stock, well knowing, as he must be presumed to know, that such a retainer was not, and could not fall within the scope of the legitimate professional employment. Indeed, he prefaces his communication with the suggestion that "now that you have been elected a member of the House of Delegates you can be of considerable

service to me and my friends in the House of Dele-
gates.'' It was not as attorney that he desired his ser-
vices, but as a member of the House of Delegates, a
position which he supposed would readily secure him
consideration at the hands of Stock or those whose rep-
resentative he was.

But conceding that Lehman intended to employ
Reiss because he was attorney at law to secure the cor-
rupt fund deposited to pay him and his associates for
their votes in passing the bill, can it be held to be a pro-
fessional communication to Reiss in a professional ca-
pacity? Wherein does it differ in its iniquity from a
communication made with reference to a  proposed in-
fraction of the law? We have seen that it is now the set-
tled law that the latter is not privileged, and the for-
mer differs merely in degree. In each case the attorney
is consulted as to a matter which in no lawful sense is a
matter of professional duty. He can no more be em-
ployed to assist one criminal in requiring or inducing
his confederate in crime to disgorge the price of his
crime, than to advise and devise means for executing
it in the first instance. Neither being a matter in which
there can be professional confidence, and neither within
the scope of professional employment, neither is priv-
ileged.

It follows that this objection, so far as Lehman was
concerned, was not tenable, but the statement should
have been excluded on Faulkner's objection, because in
the absence of proof of a conspiracy between this de-
fendant and Lehman and Murrell and others to pass the
bill in consideration of the bribe and made in the ab-
sence of this defendant, it was hearsay and inadmissi-
ble.

## VIII.

We come now to the exceptions urged against the
instructions of the court.

In its first instruction the court directed the jury
that if they found from the evidence "that after being

sworn by the foreman of the grand jury and before the said grand jury, he, the defendant, did then and there falsely swear and testify under oath that he did not know of *and had never heard* of the existence of the $75,000 deposited in the Lincoln Trust Company, and if you further find from the evidence that in truth and in fact the defendant did, at the time he so testified under oath, well know, aside from any information he may have acquired through the newspapers, of the existence of the said $75,000, and that said sum was deposited in a lock box in the safe deposit vault of said Lincoln Trust Company, and that when he so swore and testified under oath he willfully and corruptly testified falsely, they would find him guilty of perjury,'' etc.

The objection is, first, that it submitted to the jury whether defendant committed perjury by swearing he had never *heard* of the existence of said $75,000; whereas the indictment does not negative the truth of his evidence that he had *not heard* of said fund, but assigns as perjury only that ''in truth and in fact he well *knew* of the existence of said sum.''

It requires no discussion to demonstrate that there is a radical distinction between *knowing* a fact and merely *having heard of* its existence. That the pleader recognized this is apparent in that he only charges that the defendant testified falsely *that he did not know* of the $75,000 and does not allege perjury in his testimony that he had *not heard* of it. Now it is at once obvious that in submitting to the jury whether defendant falsely and corruptly testified *he had not heard* of said $75,000, the court submitted an issue not tendered in the indictment. Under the Constitution of this State, ''In criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation.'' [Sec. 22, art. 2, Const. of Missouri.]

Everywhere it is held that the assignment of the perjury is an absolutely essential part of an indictment for that crime, whether at common law or under our

constitutional guaranties. The assignment of the per-jury is that part of it which expressly alleges the *falsity* of the testimony given by the accused.

This is a rule of criminal pleading that goes to the very substance of things. Hence, the general averment that the defendant swore falsely upon the whole matter of the oath is not sufficient, but the indictment must proceed by particular averments to *negative that which is false,* and the prosecution is bound, in assigning the perjury, only to negative such parts as he can falsify, admitting the rest. [Gibson v. The State, 44 Ala. 23; Wharton's Amer. Crim. Law, sec. 2259.] The necessity for such averment arises out of the settled rule that every fact and circumstance necessary to constitute the offense must be specifically set forth in the pleading and that a fact not averred can not be proved or goes for nothing if proved. [People v. Gates, 13 Wend. 311; People v. Miller, 2 Parker's Crim. Rep. 197; Com. v. Still, 83 Ky. 277; Gabrielsky v. The State, 13 Tex. App. 428.]

Applying these universal principles of criminal pleading it is plain that unless we deny the defendant his right to be informed of the nature and cause of the accusation against him, in an indictment for perjury, he is entitled to be told in the indictment wherein and to what extent the statements alleged to have been made by him were false that he may know what he is to answer, because the presumption is that what is not charged in the indictment does not exist, and hence, when in this case the pleader only negatives the defendant's evidence that he did not *know* of the $75,000 and nowhere negatives his evidence that he had not *heard* of it, so far as the indictment goes, this is an admission or concession that his testimony that he had *not heard* of the $75,000 was *true,* and hence, when the court submitted the issue whether it was false, it framed an issue not in the indictment.

The court had no power in this manner to supply by its instructions an averment not in the indictment and permit, as it did, a conviction on a charge not included therein.   This was reversible error.   [State v. Smith, 119 Mo. 447; State v. Hesseltine, 130 Mo. loc. cit. 475.]

Under this instruction the defendant might have been convicted on the charge that he had not heard of the $75,000, whereas no perjury is assigned on that part of his evidence.

Another objection made to this instruction is that it impliedly at least authorized the jury to find that defendant knew of said $75,000 if he had *heard of it by rumor or otherwise* than by reading of it in the newspapers.

We think this is also a fair criticism of this instruction on this point.   It is true the court required that the defendant should *know*, and as the evidence of the stenographer of the grand jury showed beyond a doubt that defendant testified he had read of it in the newspapers, the court properly cautioned the jury that such information was not *knowledge* under the indictment.   We do not think that by excluding what he had read in the papers, the court cured the error of submitting to the jury whether defendant had falsely sworn *he had not heard* of the $75,000 otherwise than by reading of it in the newspapers.

In this connection the propriety of the refusal of the fourth instruction requested by defendant must be determined.   That instruction is in these words:

"4.   The jurors are instructed that unless they believe beyond a reasonable doubt, from all the evidence in the case, that the defendant, on January 31, 1902, had personal knowledge, or had heard prior to January 31, 1902, or learned from John K. Murrell or Philip Stock of the existence of $75,000 deposited in the Lincoln Trust Company for the purpose of influencing, bribing or corrupting any member of the House of Delegates for his vote or influence in the passage of Council Bill

No. 44, then defendant is not guilty of the offense charged, and that it is your duty to acquit the defendant, and the court in this connection further instructs you that personal knowledge is not knowledge derived from gossip, rumor or hearsay, but is knowledge which one has from the exercise of his own senses, and that in this case unless defendant saw Philip Stock and J. K. Murrell, or either of them, deposit $75,000 in a box in the Lincoln Trust Company, he had in law no knowledge that $75,000 was deposited in the Lincoln Trust Company unless said Philip Stock or J. K. Murrell told him that said money was so deposited.''

This embodies a distinct proposition from that in the first instruction for the State.

In the latter the jury are required to find knowledge aside from newspaper publications. Defendant in this instruction requests the court to specifically define the sources of knowledge, and in what it consists.

This instruction, so far as it goes, is correct, but as the State was proceeding on the theory of a conspiracy, the instruction should have gone further and stated the further alternative, ''or that defendant at and prior to the deposit of said $75,000 by said Stock and Murrell was and had been a member of a criminal conspiracy or combine to obtain said sum under an agreement with said Stock in consideration of their votes to pass said Suburban ordinance, and that said Murrell was also a member thereof, in which case, if they so find, the defendant would be chargeable with knowledge of the acts of said Murrell and of the knowledge possessed by said Murrell during the continuance of and in furtherance of said unlawful conspiracy.''

IX.

Error is asserted in refusing the fifth instruction requested by defendant as follows:

"5.   The court instructs the jury, if they believe from the evidence that the grand jury within and for the body of the city of St. Louis that was convened on January 30, 1902, had instructed the circuit attorney or assistant circuit attorney to prepare indictments against Charles Kratz and J. K. Murrell, on or prior to January 30, 1902, then the testimony of the defendant could not have been material to the investigation of any complaint against such Kratz and Murrell, and said defendant, when he testified before said grand jury, could not have testified to anything material to the charge against said Kratz and Murrell, and you should find the defendant not guilty."

The fact that the grand jury had voted to indict Kratz and Murrell prior to defendant's giving his testimony before that body and prior to the return of the indictment into open court, in no manner affects the defendant's responsibility for the falsity of his evidence given before said grand jury in the further investigation of the case, or its materiality.  It was entirely competent for the grand jury to continue their investigation to ascertain all the legal, competent and material evidence in regard to said charge against Kratz and Murrell or either of them.   Notwithstanding they had voted to indict Kratz and Murrell it was within their power to have reconsidered such vote and refused to find a true bill. The only limitation on their power to require witnesses to be brought before them is contained in section 2498, Revised Statutes 1899, which prohibits them "*after* the finding and *returning* of any indictment" from requiring any person known or believed to be a witness for the person so indicted to be summoned before them, except upon the written order of the judge of the court into which such indictment has been returned.

Until such indictment *is returned* in open court, signed by the prosecuting attorney and attested by the foreman, it is not an indictment.

## X.

By far the most important question raised by defendant's appeal is found in the third instruction prayed by him in the following words.

"3.   The jurors are instructed that under the Constitution of the State of Missouri no person can be compelled to testify against himself in a criminal case, and that if you believe from the evidence that on the 31st day of January, 1902, the grand jury of the State of Missouri, within and for the body of the city of St. Louis, were investigating a charge against this defendant and he was summoned to appear before them, and that upon said hearing he was not notified that he could not be compelled to testify against himself, and that said grand jury compelled him to so testify, then, the defendant in giving testimony at such time before such grand jury could not be guilty of perjury, and it is your duty to acquit the defendant."

It is obvious that there are at least two, if not three, distinct legal propositions involved in this instruction.   The first is an old and time-honored maxim of the common law, "*Nemo tenetur seipsum accusare*" (No one shall be compelled to accuse himself).

As said by Judge BARCLAY in State ex rel. Attorney-General v. Simmons Hardware Company, 109 Mo. 125-6.  "To fully grasp its meaning we must note its place in the history of the law as one of the most important of the rules of procedure that express the fundamental difference between the criminal practice prevailing in continental Europe, and that of countries which trace their laws, as we do, to the English source. In the former, the accused is required to submit to a rigid official examination touching the charge against him. In the latter such an examination is positively forbidden.   The reason of this difference is found in that higher regard for the personal rights of the individual citizen, which obtains in countries following the En-

glish common law, and to which is traceable the growth of that independent spirit which has secured to the people of those countries so large a share of liberty, and placed them in the vanguard of the world's progress.''

In Missouri it forms one of the sections of our Bill of Rights, our organic law: ''No person can be compelled to testify against himself in a criminal cause.'' In every State of the Union a similar provision is found in its Constitution. It is also firmly embodied in the Constitution of the United States. The courts have jealously enforced it in all cases in which it was properly invoked. Mr. Justice BRADLEY, in Boyd v. United States, 116 U. S. loc. cit. 631, voiced the sentiment of all American courts and lawyers when he said: ''Any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it can not abide the pure atmosphere of political liberty and personal freedom.''

In our own jurisprudence, from the first volume of our reports down to the last, the same principle has been fearlessly announced and adhered to. It is not to be abandoned to subserve the exigencies of any particular prosecution. Constitutional safeguards which have resisted the assaults of monarchical power for centuries in England, and withstood momentary clamor in this country throughout our national existence, are not to be frittered away at the demand of these who have apparently studied the fundamental principles of our free institutions to little advantage, when they demand that this universal principle of the common law and this constitutional guaranty of our Federal and all the State Constitutions shall be abro-

gated because it may prove an inconvenient barrier to the investigation of some flagrant crime or crimes. It was framed by James Madison as it appears in the Federal Constitution, and no American statesman or lawyer has ever advocated its repeal.

So far as this instruction announces this obvious and just principle of law, it is unquestionably correct, but its application to the facts of this case is another matter. Having announced the exemption from being compelled to testify against himself, the instruction proceeds to submit to the jury whether the grand jury was investigating a charge against the defendant. Learned counsel insist that this is apparent from his examination, and have reproduced the examination of the stenographer, Buck, and of defendant before the grand jury, from which it appears the defendant was summoned as a witness before the grand jury in the investigation of the charge of bribery against Kratz and Murrell; that he was closely questioned as to his knowledge of the combine in the House of Delegates, its purposes, and from the nature of the questions put to him it may be inferred that the grand jury or circuit attorney suspected him of being a party to the bribe agreed upon between Stock and Murrell. It also appears that the defendant disclaimed all knowledge of the said bribe, and denied that he was a member of any corrupt combine.

At no time did he decline to answer on the ground that it would or might incriminate himself. It further appears he was not advised or notified that he need not answer any question put to him if he thought it might tend to criminate him. In support of the proposition that because the grand jury suspected the defendant was a party to the corrupt agreement between Stock and Murrell and still persisted in questioning him as to his knowledge of it without advising him of his privilege, the defendant could not be convicted of perjury even though he knowingly and willfully testi-

fied falsely on that matter, counsel refer us to various cases, which we have examined.

The first is that of State v. Young, 119 Mo. 520. That was a prosecution for murder. The defendant, an ignorant boy, had been summoned before the coroner and required to testify as to his presence in the vicinity of his father's house on the night of the homicide. Afterwards on his trial on an indictment for murdering his father, what he testified to before the coroner was admitted against him as his admissions and this was assigned as error. After a full review of all the attainable cases we ruled that his testimony thus obtained without notifying him of his privilege and after he was suspected, was not a voluntary admission and was inadmissible on his trial for murder. Whether he could have been tried for perjury if he had falsely testified was not involved in the record and of course was not passed upon. It was, however, ruled that if the defendant had voluntarily testified and not by compulsion his statements would have been evidence even though it had been a preliminary trial of himself for the murder.

State ex rel. Attorney-General v. Simmons Hardware Co., 109 Mo. 118, arose on an information by the Attorney-General under the Act of 1889, for the punishment of ''Pools, Trusts and Conspiracies,'' and upon the refusal of the defendant to answer under oath the letter of the Secretary of State as to whether it had merged its business in or with any trust, etc. The defendant challenged the constitutionality of the law requiring it to answer under oath touching a matter which might form the subject of a criminal prosecution against it or its officers, and it was unanimously held that under section 23, article 2, of our Constitution, it could not be compelled to testify against itself. It asserted its privilege and refused to so testify and its position was sustained. No question as to whether its officers could have been prosecuted for perjury and con-

victed if they had falsely sworn in answer to such inquiry, was in the case.

.Counselman v. Hitchcock, 142 U. S. 547, arose on a habeas corpus, wherein the petitioner had been imprisoned for refusal to answer a question which would have subjected him to a prosecution for a violation of the Interstate Commerce Act of Congress. He claimed his privilege and exemption and he was discharged by the Supreme Court of the United States. The question of his liability if he had falsely testified, was not in the case.

Boyd v. United States, 116 U. S. 616, was an information under the customs revenue laws and the district court, under the fifth section of the Act of 1874, required the defendant to produce an invoice, and it was ruled the act was unconstitutional in that it required him to testify against himself.

In Cullen v. Commonwealth, 24 Gratt. 624, the defendant was asked by the grand jury to state whether he knew of a certain duel and he declined to answer because his answer would tend to criminate him. On his refusal the hustings court committed him to jail. The Court of Appeals of Virginia discharged him on habeas corpus, because the act of the Legislature of Virginia invaded his constitutional right to refuse to give evidence tending to criminate himself. No question of his liability for perjury for false testimony was involved or decided.

People v. Mondon, 103 N. Y. 211, was a prosecution for murder, and the prisoner, an ignorant Italian laborer, unfamiliar with the English language, was called as a witness before the coroner's jury, and examined by the district attorney and coroner. He was indicted and his testimony on the inquest was offered against him and the Court of Appeals of New York ruled his answers were not voluntary and were inad-

missible.  To the same effect is People v. McMahon, 15 N. Y. 384, but in neither case was the question now raised in any manner decided.

In People v. Mondon, 103 N. Y. l. c. 221, the court says:  "When a coroner's inquest is held before it has been ascertained that a crime has been committed, or before any person has been arrested charged with the crime, and a witness is called and sworn before the coroner's jury, the testimony of that, witness, should he afterward be charged with the crime, may be used against him on his trial, and the mere fact that at the time of his examination he was aware that a crime was suspected, and that he was suspected of being the criminal, will not prevent his being regarded as a mere witness, whose testimony may be afterward given in evidence against himself.  *If he desires to protect himself he must claim his privilege.*"

State v. Clifford, 86 Iowa 550, holds that the involuntary admissions of one made under oath before a grand jury in respect to an offense for which he is then under arrest and without being informed of his rights in the premises or of the effect of his testimony, are not competent evidence against him upon a subsequent trial under the indictment for such offense.

Emery's Case, 107 Mass. 172, was one in which the witness claimed his privilege before a joint committee of the Senate and House of Massachusetts.  He was imprisoned for refusal to answer and was discharged on habeas corpus by the Supreme Court of Massachusetts.

One other case, not in the printed brief, is United States v. Edgerton, 80 Fed. 374.  This is a case in the district court of Montana.  The decision was made on a motion to quash an indictment, first, because one Flynn, an expert witness, was permitted to remain in the grand jury room and hear the testimony of other witnesses and examine them; second, because, while investigating the offense for which the defendant was indicted, he

was called as a witness before the grand jury to testify as to that offense, without being informed or knowing that his own conduct was the subject under inquiry. The court quashed the indictment on both grounds and for other reasons also it would appear. While not the opinion of a court of last resort, the case appears to have been well decided. It is in line certainly with the reasoning upon which the other cases cited depend. It is intolerable that one whose conduct is being investigated for the purpose of fixing on him a criminal charge should, in view of our constitutional mandate, be summoned to testify against himself and furnish evidence upon which he may be indicted. It is a plain violation both of the letter and spirit of our organic law. Such a practice can not be too strongly condemned and scrupulously avoided by those entrusted with the administration of the criminal law, but it is obvious at a glance that this case, like all the others cited, does not meet the question before us.

1 Greenleaf on Evidence, sec. 225, treats merely of the manner of the examination of the prisoner and voluntary confessions.

Cooley on Constitutional Limitations is cited to the effect that the proceeding to establish guilt shall not be inquistorial and that the peculiar excellence of the common-law system of trial over that which has prevailed in other civilized countries, consists in the fact that the accused is never compelled to give evidence against himself.

The other text-books cited only confirm the foregoing adjudicated cases. It will be observed that the principles to be extracted from them is, *first*, that the witness can not be compelled to criminate himself; *second*, that it is his personal privilege to decline to testify and he may voluntarily waive it; *third*, that if compelled to testify after arrested or before arrest before a coroner's jury, after he is suspected, his admissions are not voluntary and can not be used against him

on a subsequent trial for that offense—and such is the force of State v. Young, 119 Mo. 517.

But the point which we are to determine is whether a witness, not under arrest for a crime, and summoned before a grand jury in the investigation of the guilt of others, can fail to claim his privilege or waive it, and testify *falsely*, and be absolutely exempt from a prosecution for perjury for such false swearing. The proposition reduced to its last analysis is, that as no person can be compelled to testify against himself, he may waive his privilege, testify falsely, and yet incur no liability for perjury. In another form it may be stated that since he can not be compelled to incriminate himself, and as by testifying *falsely* he does incriminate himself by committing perjury, therefore, he can not be prosecuted for it.

Two answers readily suggest themselves to this proposition that the witness in such circumstances is justifiable in committing perjury, and they are these: first, he may refuse to answer, and if the court shall deny his privilege and commit him, he can be released on habeas corpus; or, second, if he yield to the order of the court and testify truthfully and his truthful evidence leads to his indictment, it can not be used against him on the trial, and if it is improperly admitted the appellate court will reverse the trial court. So that two lawful avenues are open to him by which he may avoid the road to perjury and a prosecution therefor. The point has received careful consideration in our sister States. Thus in Mackin v. People, 115 Ill. 312, the Supreme Court used this language: "Assuming the answers to the questions propounded to defendant would have disclosed criminal conduct on his part, it was his privilege to decline to answer, and his refusal could not have been made the basis of any prosecution against him. Of course no one can be compelled to give evidence against himself, and the law secures to every one when testifying in any legal proceeding,

whether before the grand jury or in the trial court, the privilege to answer or decline to answer, if, in his opinion, the answers to the questions would tend to disclose matters that might criminate him.   The privilege secured is, however, a personal one, and if he shall waive it, and elect to testify, he must do so with as much truth and candor as if testifying concerning other matters as to which he is bound to answer, *and if his testimony is willfully false,* perjury may be assigned upon it. [State v. Maxwell, 28 La. Ann. 361.]   It has been held on various occasions that where a party is erroneously sworn in his own behalf, perjury might be assigned upon his testimony, if false.'' [Chamberlain v. People, 23 N. Y. 85; Van Steenbergh v. Kortz, 10 Johns. 167; Pratt v. Price, 11 Wend. 128.]

Again, in State v. Turley, 153 Ind. 345, the defendant was indicted for perjury.   In the course of the opinion the court says:   "It may be that appellee could not have been required to answer any questions in regard to statements made by him, if any, concerning his bribing or offering to bribe the engineer, or to testify to anything connected therewith, if he had declined to answer on the ground that his answer would tend to criminate him, but when he testified, if his testimony or any part thereof *was false,* he is subject to prosecution for perjury the same as any other witness.'' [Gillett's Crim. Law, sec. 691; Anon., 3 Salkeld 248; Croke, Eliz., 486.]

In State v. Maxwell, 28 La. Ann. 361, the error alleged was "that the assignment of perjury is upon a question which the State had no legal right to ask and which the witness could have refused to answer."   To which the court responded:   "If the answer would criminate the witness he might refuse to answer, and the court would not compel a response.   Here the witness made no objection."   The judgment was affirmed.

Greenleaf in his work on Evidence (15 Ed.), 3 vol. sec. 191, says:  "The competency *of the witness*

to testify, or the fact that he was not *bound* to *answer* the question propounded to him, or the erroneousness of the judgment founded upon his testimony, are of no importance; it is sufficient, if it be shown that he was admitted as a witness and did testify."

In State v. Terry, 30 Mo. 368, the prosecution was for perjury committed before the grand jury in falsely swearing the defendant did not know of any person who had bet upon any game of cards in the last twelve months in Cole county. On the part of defendant it was urged "that the defendant could not be compelled to answer; that if erroneously compelled to testify, perjury could not be assigned upon his answer, and that having answered voluntarily, there can be no better foundation for an assignment of perjury than if forced," but Judge Scott rejected the proposition and affirmed the judgment. [Com. v. Turner, 98 Ky. 528.]

The one case cited by counsel which they assume goes to the extent of holding that if a witness is required by a grand jury or court to testify to facts tending to criminate him, perjury can not be assigned on such evidence, is Pipes v. The State, 26 Tex. App. 318. It is true there is a dictum to that effect in that case, but Judge Hart says no such state of facts appeared in that case, and hence it is lacking in weight as authority. Profound as is our respect for the learned judge who wrote that opinion, this *obiter* is not convincing.

In our opinion, because a court requires a witness even erroneously to testify to a matter which he is justified in refusing to answer, is no ground for charging the court with having compelled him to testify to that which is *false*. It may be and is wrong to require him to testify to the truth if it would incriminate him, but it can not be said that merely because it wrongfully requires him to answer that it compels him to testify falsely. If he answers truthfully he can not be punished for perjury, and, as already said, he has two

modes of redress if called upon to testify to that which is privileged.   He may decline and claim his privilege and have his redress by habeas corpus, if imprisoned, or if he yields and saves his exceptions, he can appeal and have the judgment reversed, as is often done.   In this case he made no claim of privilege, and it is everywhere ruled that this is a personal privilege which he may waive and must be held to have waived when he voluntarily answers without objecting to it that it would criminate him.   [State v. Douglass, 1 Mo. 527, and cases cited.]

Our conclusion is that the instruction goes too far and was properly refused.

## XI.

We see no occasion for following counsel in their learned discussion of what constitutes the *corpus delicti in perjury*.   The court in its first instruction properly defined the elements of the offense, save in submitting to the jury whether defendant falsely testified that he had not *heard* of the $75,000.   He next properly instructed the jury as to the amount of proof necessary to convict.

## XII.

There was no error in refusing defendant's sixth instruction which required the jury to find defendant not guilty unless they found beyond a reasonable doubt that Stock was employed to secure the passage of the Suburban bill "by direction and authority of the board of directors of said Suburban Railroad Company to secure the passage of said ordinance."   This is predicated on the theory that no officer of the company was authorized to employ any one to do any illegal act for said company without direct authority of the board of directors.

We answer that the board had no such authority itself. It was not a case against the corporation. The evidence was carefully guarded by the court in its sixth instruction, and it was overwhelming, so far as the criminal conduct of Stock and Murrell was concerned, to establish that Stock was the representative of the company through its president, Turner, and so far as the bribery was concerned, it needed no formal action of the board. The board was not indicted or on trial. The evidence fully sustained the charge that Stock was the criminal agent working in the interest of the company under the direct orders and the full cognizance of the executive head of the company. There was no substantial variance in the proof from the allegation of the indictment.

The same may be said of defendant's seventh instruction. The court fully instructed the jury that the evidence of the agreements between Stock and Murrell and Turner was admitted solely to establish whether such a deposit was made, and its purpose, and that by itself "it does not tend to prove and should not be considered by you as tending to prove that the defendant had any knowledge of such deposit."

Again it is insisted the court erred in refusing defendant's instruction which is as follows: "The court instructs the jury that the true test of whether the alleged testimony given by the defendant before the grand jury was material, is this: Was it of such a character that if true it would have properly influenced the action of said grand jury in any material matter affecting the alleged investigation by them as to whether one John K. Murrell had been guilty of bribery; and if the jury find from the evidence that the alleged testimony could not properly have influenced the action of said grand jury, with reference to said action, then it is wholly immaterial whether it was true or false, and the jury should find the defendant not guilty."

The court had already instructed the jury that if defendant did know of said deposit and the corrupt purposes for which it was made, and falsely testified before the grand jury that he did not know of it, he was guilty. To have given defendant's instruction would have submitted to them whether in law the question was material and contradicted its own instruction. The materiality of the evidence was a question of law which the court could not have properly submitted to the jury. There was clearly no error in refusing it. [State v. Williams, 30 Mo. 364.]

The tenth instruction asked by defendant was correct, but was fully covered by the court's instruction as to the quantum of evidence required to convict of perjury, and to that extent there was no error in refusing it, but the court's eighth instruction contains the same vice already noted in its first instruction, to-wit, that it submitted to the jury a question of fact whether defendant had falsely sworn that "*he had never heard* of the existence of the $75,000 alleged to have been deposited," or "*had never heard* of the existence of the aforesaid $75,000." Otherwise that instruction was well enough, but for the error pointed out was reversible error, because no such assignment of perjury was averred in the indictment.

We have now gone through all the alleged errors. It remains only to note the evidence tending to establish the agreement between Stock and Kratz as to the bribery of certain members of the Council. That evidence was wholly irrelevant to the issue in this case, and its effect could only have been to prejudice the minds of the jury and impress them with the appalling extent to which corruption had crept into the municipal government of the city. It should have been excluded.

We have unavoidably been compelled to make this opinion of great length, but the importance of the questions raised and so ably discussed by counsel must be our excuse for so doing.

This record contains so much uncontradicted evidence of venality that it is little wonder that decent people of all classes are appalled at its extent. The sole consideration of this court necessarily has been to determine whether the defendant was convicted in compliance with the laws of the State. The crime charged is one of the most heinous known to our criminal jurisprudence. If guilty the defendant should be punished, but it is the high and solemn duty of this court, from which we shall not shrink, to require and exact that however guilty he may be, he shall be punished only after having been accorded every right and guaranty which the organic and statute law of the State secures to him, and not only him but to every other person charged with crime, before he can be deprived of his liberty.

We have kept in mind that we are an appellate court. With questions of fact, as such, we have nothing to do, save only to see that there was sufficient legal evidence thereof to be submitted to the jury. The questions of law have received our most careful consideration and for the errors pointed out, the judgment must be and is reversed and the cause remanded to be tried in accordance with the views we have expressed.

*Fox* and *Burgess, JJ.,* concur.