

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,          )
         )
         Respondent,      )
         )
v.          )      No. SC94226
         )
BRENDA CHURCHILL,          )
         )
         Appellant.      )

### APPEAL FROM THE CIRCUIT COURT OF MONROE COUNTY
The Honorable Rachel Bringer Shepherd, Judge

### *Opinion issued February 3, 2015*

The juvenile officer for the 10th Judicial Circuit received information that Brenda Churchill ("Churchill") had a son ("JC"), who was approximately five years old and who was in need of protective custody under section 211.031.1(1).[1] Churchill denied that JC existed, however, and efforts to locate JC proved unsuccessful. As a result, the juvenile officer filed an "Emergency Petition for Protective Custody" in the juvenile division of the circuit court of Monroe County. A summons was served on Churchill to testify at an initial hearing set for June 10, 2011, and to "have said juvenile with you then and there if the juvenile is in your custody." Churchill appeared without JC and testified repeatedly

---

[1] Unless otherwise indicated, all statutory citations are to the Revised Statutes of Missouri, as amended through the Cumulative Supplement 2013.

under oath that JC did not exist. Two weeks later, Churchill surrendered JC to the juvenile officer and conceded that he was her child.

Based on the false testimony she gave at the protective custody hearing, Churchill was charged with perjury. She moved to suppress her testimony from the protective custody hearing on the ground that it resulted from violations of her constitutional and statutory rights to counsel and her constitutional privilege against self-incrimination. This motion was overruled. Following a bench trial, Churchill was found guilty and sentenced to four years in prison. This Court has jurisdiction of her appeal, *see* Mo. Const. art. V, § 10, and the judgment is affirmed.

## Background

Prior to the events underlying this criminal case, Churchill gave birth to six children. All six children were removed from her home, and Churchill's parental rights were terminated. Based on concerns for the welfare of a seventh child believed to be living with Churchill, the juvenile officer filed an "Emergency Petition for Protective Custody." On June 9, 2011, Churchill was served with a summons to appear at a hearing on this petition the following day and to bring JC with her. Churchill appeared at the protective custody hearing, but did not produce JC.

At the hearing, counsel for the juvenile officer elicited testimony from two of Churchill's relatives. First, Churchill's oldest daughter testified that she had seen a child named JC at her mother's home and he appeared to live there. She did not know whose child JC was, however, because Churchill said the child belonged to the witness' sister who lived in New York. Second, Churchill's father testified that JC was Churchill's

child and was living with Churchill. Though he initially thought the child belonged to his granddaughter who lived in New York, he later learned this granddaughter was unable to have children. He testified that, after he learned the child could not be his granddaughter's, "it all come out in the open it – it was [Churchill's] child."

After requesting the court take judicial notice of the files from prior proceedings in which Churchill's parental rights concerning her six other children were terminated, the juvenile office called Churchill to testify:

> THE COURT: Miss Churchill, please come forward and be sworn. Please raise your right hand. Do you solemnly swear that the evidence you shall give in this case now appearing will be the truth, the whole truth, and nothing but the truth so help you God?
>
> THE WITNESS: I just -- I want legal counsel.
>
> THE COURT: Well --
>
> THE WITNESS: (Inaudible). But yes, sir.
>
> THE COURT: All right.
>
> THE WITNESS: Yes, sir.
>
> THE COURT: All right. Fine. Before you start. Miss Churchill, have a seat. Just let me say this is not the end of this procedure. This is merely the beginning of this procedure. You certainly have the right to legal counsel. We're not going to make any final determinations until you have legal counsel. What we're going to do today, if anything, would be a temporary matter.
>
> If you cannot afford legal counsel, we will appoint one for you. Certainly if at a certain point you want another judge to proceed in this matter other than me, because I've got a certain amount of involvement certainly with your prior cases, that's something you can also request. We are going to proceed with as much of this hearing as we can today. All right?
>
> THE WITNESS: I -- I want legal counsel, sir, please.
>
> THE COURT: Well, that I understand.
>
> THE WITNESS: Okay.

3

At this point, counsel for the juvenile officer began questioning Churchill. Churchill's answers were cogent, responsive, and apparently accurate. When counsel began questioning her about JC, however, the following colloquy took place:

Q. All right. You have a son named [JC], is that true?

A. No, sir.

Q. And your son's -- this child's date of birth is 2/16 of '06, isn't that true?

A. No, sir.

Q. You're saying that's not true?

A. I'm saying that is not true.

Q. All right. Do you know a [JC]?

A. There is no [JC].

Q. All right. You were here when your father testified, is that right?

A. Yes.

Q. And you were here when your daughter testified.

A. Correct. There is no [JC].

Q. All right. Is there a -- do you have a child that's approximately five or six years old?

A. No, sir, I do not.

\* \* \* \*

Q. And you do understand you're under oath?

A. I am under oath. And I want to stop these proceedings. Because I was served yesterday and I'm trying to find an attorney[.]

Churchill then explained that she was caring for her mother, who was in a residential care facility. She said that a state caseworker had been assigned who was "handling this." Churchill said: "This is an abuse case. That's why I said legal counsel." Churchill then volunteered that the child others had seen in her home was her oldest daughter's own son and repeated: "I want an attorney." She said that members of her

4

family had threatened to do "whatever they had to to get me out of my mother's life," and repeated: "I would like to pursue this with an attorney, please."

When Churchill was told that the protective custody hearing concerned only the child's immediate welfare, she responded: "I do realize that, and I want an attorney, because I've been threatened …." She stated that she had been "trying to get ahold of legal counsel." When counsel for the juvenile officer again tried to question Churchill about JC, Churchill denied that JC existed, attempted to change the subject to her mother, and then stated: "I want an attorney because I've been threatened."

After the juvenile officer's counsel ended his examination, the court verified that Churchill intended to retain her own attorney. The court stated: "If you cannot get one, then let me know and I'll appoint an attorney for you." But, when the court renewed its order to Churchill that she produce the child, Churchill insisted: "There's no child." The court explained to her that, if she was not telling the truth and there was a child, "you're going to be thrown in jail on a high bond for failure to obey a judge's order" and "charges will probably be brought against you by the … prosecutor's office for perjury."

Frustrated with its inability to order protective custody for a child who could not be located or definitively proved to exist, the court stated: "I can't give any order to take custody of a child we don't have." Accordingly, the court stated:

> THE COURT: All right. Specifically my order will be produce the child by 8:00 a.m. Monday morning. And specifically, if you don't have an attorney by 8:00 a.m. Monday morning I want to know so that I will appoint an attorney for you.
> THE WITNESS: I have contacted [an attorney's] office in Columbia --
> THE COURT: Well, contact is fine, but --

5

THE WITNESS: -- and she will be back Tuesday. Tuesday, sir.

THE COURT: I'll give you until Tuesday noon.

THE WITNESS: Thank you.

THE COURT: Thank you. But again, my specific order is to produce the child by 8:00 a.m. Monday morning.

THE WITNESS: Yes, sir. There is no child.

Two weeks later (a total of 17 days after the date she was first ordered to produce JC), Churchill and her counsel surrendered JC to the custody of the juvenile officer.

Nearly a year after these events, Churchill was charged with perjury based on the false testimony she gave at the June 10, 2011, hearing. She moved to suppress that testimony on the ground that the conduct of that hearing violated her right to counsel and her privilege against self-incrimination. The trial court held a hearing on Churchill's motion and, after receiving evidence and argument, overruled it.

Churchill waived her right to a jury trial, and the case was tried to the court. She elected not to testify or offer any evidence contesting her guilt. Instead, Churchill's defense counsel called several character witnesses on her behalf and, in the penalty phase, sought leniency for Churchill:

> So we have an opportunity to convict a person with a perjury because that's crystal clear, and lying to the court is wrong. There's no defense to that. We acknowledge that, and she has taken responsibility. She has right in the SAR. It's documented by probation and parole. She said, I lied on the stand. She admitted it. She acknowledges that she doesn't have a good faith basis to do it.

The trial court found Churchill guilty of one count of perjury and sentenced her to four years in prison.

6

**Analysis**

On appeal, Churchill maintains that the trial court erred in overruling her motion to suppress. And, if the evidence of her false testimony had been suppressed, she claims that the remaining evidence was constitutionally insufficient to support her conviction. In addition, she claims that the state failed to prove that her false testimony was "material" and that the trial court clearly erred by not acquitting her on the basis that she recanted her false testimony by producing JC two weeks after the hearing.

**I.      Suppression of Churchill's False Statements**

A trial court's ruling on a motion to suppress will be affirmed if it is supported by "substantial evidence" either from the suppression hearing or at trial. *State v. Gaw*, 285 S.W.3d 318, 319 (Mo. banc 2009). This Court will defer to the trial court's credibility determinations, but will review questions of law *de novo*. *Id.*

Churchill's motion to suppress sought to exclude the testimony she gave during the initial protective custody hearing because she requested – and was denied – a delay in those proceedings until she could obtain legal representation. Her motion claims that the protective custody hearing violated her right to counsel under the 5th, 6th, and 14th Amendments to the United States Constitution, and article I, sections 1, 10, 18(a) and 21, of the Missouri Constitution. Her motion also claims that the denial of counsel violated her constitutional right of due process.[2]

_____

[2] Churchill's motion did not assert that she had a right to counsel under Missouri statutes, or that the judge violated her her 5th Amendment privilege against self-incrimination (or the corresponding privilege under article I, section 19 of the Missouri Constitution), when he allowed her to be questioned without counsel. Because these claims (like those raised in her

7

## A.    The Right to Counsel

Churchill's claim that she was denied counsel under the Sixth and Fourteenth Amendments (and article I, section 18(a) of the Missouri Constitution) is quickly dispatched.  By their express terms, these rights are limited to "criminal prosecutions." The juvenile officer's petition for protective custody was a civil proceeding, and these constitutional guarantees are not applicable.  *See Turner v. Rogers*, 131 S. Ct. 2507, 2516 (2011) ("Sixth Amendment does not govern civil cases"); *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (right to counsel applies only at "'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality'") (quoting *United States v. Wade,* 388 U.S. 218, 224 (1967).  *See also State v. Adams*, 483 S.E. 2d 156, 157 (N.C. Sup. Ct. 1997) (mother's Sixth Amendment right to counsel did not attach upon the filing of a petition alleging abuse and neglect of a child, which commenced only a civil proceeding); *In re AMB*, 640 N.W.2d 262, 303–04 (Mich. Ct. App. 2001) ( "Sixth Amendment right to counsel and the analogous state [constitutional] right to counsel … do not apply directly to child protective proceedings because these proceedings are civil, not criminal, in nature" and because "the right to counsel in a protective proceeding is statutory, not constitutional").

By the same token, Churchill's claim that her due process rights were violated at the protective custody hearing also fails.  She claims that due process requires legal representation in civil cases which can result in imprisonment.  *See State ex rel. Family*

---

motion) fall short of establishing a basis for relief in this Court, they are analyzed without deciding whether and to what extent they were preserved.

*Support Div. - Child Support Enforcement v. Lane*, 313 S.W.3d 182, 186 (Mo. App. 2010) (for "purposes of triggering a defendant's right to counsel under the due process clause, the distinction between a 'criminal' and a 'civil' proceeding is irrelevant if the outcome of the civil proceeding is imprisonment"). Here, Churchill was not at risk of being imprisoned based on the outcome of the protective custody hearing. To the extent she could be sentenced to prison for committing perjury during that hearing, that is not the sort of risk for which due process may require a right to counsel because that risk is present whenever any witness gives sworn testimony in any case of any nature. Unlike a contempt hearing of the sort involved in *Lane*, the purpose of the initial protective custody hearing was not to incarcerate Churchill. Accordingly, Churchill cannot claim that she had a due process right to counsel in the protective custody hearing.

This leaves only Churchill's claim that she was entitled to be represented under Missouri statutes or court rules. It is clear from the transcript that, despite the judge's efforts to explain, Churchill failed to understand the purpose of the protective custody hearing. That confusion persists in her appellate arguments. This was an initial hearing on a protective custody petition. Such a petition is not the same as a petition to terminate a parent's parental rights. Instead, it merely alleges there is a juvenile who is in need of care and treatment and state custody is warranted. *Compare* §§ 211.031.1(1) and 211.091 (describing protective custody petitions) *with* §211.447 (describing petitions to terminate parental rights).

When a protective custody petition is filed, the court must "issue a summons in the name of the State of Missouri requiring the person who has custody of the child … to

9

appear personally and, unless the court orders otherwise, to bring the child[.]" Section 211.101.1. Here, this summons was issued to "Mark and Brenda Churchill" as the people allegedly having custody of JC. This summons was served personally on Churchill. *See* § 211.111.2 ("[p]ersonal service shall be effected at least twenty-four hours before the time set for the hearing").

Churchill claims she was entitled to counsel at the initial protective custody hearing under section 211.211.1, RSMo 2000, which provides: "A party is entitled to be represented by counsel in all proceedings." But it is not clear that Churchill was a "party" for purposes of this statute, at least not at the time of the initial protective custody hearing. In this case, as required by section 211.091.1, the petition was styled "In the interest of [JC], a child under seventeen years of age." The juvenile officer is the "petitioner" and JC is the only "party." Of course, the "court *may* make a parent or guardian a party to any proceeding where the court has jurisdiction pursuant to section 211.031." § 211.132, RSMo 2000 (emphasis added). But there was no order from the court making Churchill a party to this petition for protective custody. Accordingly, it is not clear that Churchill was entitled to be represented at this initial hearing. *But see* Rule 115.03 (court shall appoint counsel for juvenile's parent, guardian or custodian in protective custody action when parent is indigent, requests counsel, and court determines that counsel is necessary for full and fair hearing).

Even assuming Churchill had a right under section 211.211.1 to be represented at the initial protective custody hearing, however, this does not mean it was error to use the false testimony she gave during that hearing as evidence in a later perjury trial. The right

to be represented at a hearing does not necessarily entail an absolute right to delay that hearing while one secures such representation. Instead, the decision whether to delay or proceed with a hearing is committed to the sound discretion of the trial court. Here, the trial court was under a statutory obligation to conduct this hearing within three days of the juvenile officer's request. § 211.031.3. Moreover, as the court repeatedly explained to Churchill, the purpose of the initial protective custody hearing was not to determine Churchill's rights. Instead, it was only to determine whether JC existed, where he resided, and whether the court should take him into protective custody until a final disposition could be ordered. Under these circumstances, it cannot be said that the court abused its discretion by deciding to proceed with the hearing notwithstanding Churchill's request for delay.

But the question here is not whether the judge erred in deciding to proceed with the initial protective custody hearing. Nor is the question whether truthful testimony given while she was unrepresented can be used against Churchill to terminate her parental rights or even to convict her of a crime. The question here is whether her sworn – but false – testimony can be used later to convict her of perjury. The answer is that it can. Accordingly, even if the Court assumes that the judge erred by proceeding with the initial protective custody hearing despite Churchill's requests for delay to obtain counsel, which seems unlikely, that error did not relieve her of her oath and obligation to tell the truth, the whole truth, and nothing but the truth.

11

It also bears noting that the court repeatedly acknowledged that it would appoint counsel to represent her if she were unable to afford representation. In this regard, Missouri law provides:

> When a [protective custody] petition has been filed and the ***child's custodian appears before the court without counsel***, the court shall appoint counsel for the custodian if it finds:
>> (1) That the custodian is ***indigent***; and
>> (2) That the custodian ***desires*** the appointment of counsel; and
>> (3) That a ***full and fair hearing requires appointment of counsel*** for the custodian.

§ 211.211.4 (emphasis added).

But this statutory right to appointed counsel is not self-executing and unlimited. The custodian must ask for counsel to be appointed and must prove that she is unable to afford counsel on her own. In addition, the statute recognizes that the judge is entitled to decline to appoint counsel if such an appointment is not necessary for a "full and fair hearing." Here, Churchill never requested that the judge appoint counsel for her, and she never even claimed to be indigent. Instead, she repeatedly stated she was in the process of obtaining counsel on her own.

Even if Churchill had requested appointment of counsel under section 211.211.4 and proved her indigence, however, the trial court did not consider her representation necessary for a "full and fair hearing" to determine whether JC existed and was in need of protective custody. Section 211.032.2 requires that an initial hearing on a protective custody petition be held within three days of a request for such a hearing. But this is not a final determination of the child's placement. The statute provides for further review (an

12

"adjudication hearing") within 60 days and, if the child is still in the state's custody, a "dispositional hearing" within 90 days and periodic hearings thereafter. § 211.032.4. Accordingly, the focus of the initial hearing on June 10, 2011, was to determine whether there was a juvenile within the court's jurisdiction and whether there were grounds to take that child into protective custody.[3] It was not an abuse of discretion to determine that Churchill's right to representation (or even appointed counsel, if she had asked for that and demonstrated her indigence) was not essential to a "full and fair hearing" on the initial hearing concerning this Emergency Petition for Protective Custody. And, as noted above, even an abuse of discretion by the judge in this regard would not give Churchill the right to give knowingly false testimony at that hearing.

Finally, Churchill's arguments prove too much. When she appeared at the initial protective custody hearing, she told the judge under oath that she had no children living with her and that "JC" did not exist. Taken at her word, therefore, she was neither a "parent" who was entitled to be represented under section 211.211.1 nor was she an indigent "custodian" who was entitled to have counsel appointed under section 211.211.4. As a result, Churchill insists (albeit implicitly) that the judge should have treated her as if her testimony was false, yet she also insists that she cannot be convicted of perjury for giving that false testimony.

---

[3] Nothing in chapter 211 requires such a hearing before a child can be taken into custody under section 211.031. The right to an initial hearing under section 211.032 and the timetable for that and all subsequent hearings is triggered when the juvenile is taken into custody. If the state is not already in custody of the child when the petition is filed but the location of the child and other circumstances are adequately known, section 211.101.3 allows a judge to order the officer serving the summons to take custody of the child before the hearing.

13

Accordingly, the Court rejects Churchill's argument that the use of her testimony from the protective custody hearing against her in a subsequent perjury trial violates her statutory and constitutional right to counsel. Even if she had such a right, it did not give her an absolute right to delay this hearing while she obtained counsel. Nor did it entitle her to frustrate that hearing by knowingly giving false testimony. If she had done or said something in that hearing which prejudiced her rights (if any) regarding the ultimate resolution of the protective custody petition or a subsequent petition to terminate her parental rights, the fact that she was forced to proceed without counsel might have more significance. But that is not this case. Here, Churchill failed to do the one thing she swore she would do and that was to testify truthfully.

### B.    The Privilege Against Self-Incrimination

Churchill also argues that the trial court erred in allowing the state to use the false testimony from the initial protective custody hearing against her at her perjury trial because she claims that testimony was elicited in violation of her state and federal constitutional privilege against self-incrimination. For purposes of this claim, the Court assumes, but does not decide, that: (1) Churchill would have been entitled to refuse to answer any question at the initial protective custody hearing when a truthful answer might have tended to incriminate her; and (2) if Churchill had been compelled to testify notwithstanding her constitutional privilege, the state would not have been allowed to use her truthful – but incriminating – testimony to prove she was guilty of whatever crime her testimony suggested. Even with these assumptions, however, Churchill's claim fails because the constitutional privilege against self-incrimination is a right to remain silent; it

14

is not a right to testify falsely. In other words, this privilege applies only to statements about a crime, not to statements which constitute a crime themselves.

More than a century ago, the Supreme Court held that the 5th Amendment privilege against self-incrimination "does not endow the person who testifies with a license to commit perjury." *Glickstein v. United States*, 222 U.S. 139, 142 (1911). As the Court explained, "the immunity afforded by the constitutional guaranty relates to the past[.]" *Id.* A false statement under oath, on the other hand, is an entirely new crime and not merely an incriminating admission concerning a past crime. Accordingly, the constitutional privilege does not apply, and there is no basis to suppress the false testimony in a later criminal trial on a charge of perjury.

Fifty years after *Glickstein*, the Supreme Court again held that the 5th Amendment privilege against self-incrimination does not bestow a license to lie. Even if the government asks a question that the constitutional privilege protects the witness from having to answer, the witness cannot simply choose to answer falsely.

> [I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions – lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.

*Bryson v. United States*, 396 U.S. 64, 72 (1969) (footnote omitted).

Even when there is no right to decline to answer – as, for example, when the law compels the filing of a tax form eliciting incriminating information – the 5th Amendment grants no privilege to commit perjury. *United States v. Knox*, 396 U.S. 77, 82 (1969)

15

(defendant charged with making false statements in a required wagering form). When the privilege applies, there are only two paths for a witness to take. She can choose not to answer, and rely on the 5th Amendment for protection from any later proceeding based on that failure (e.g, a contempt proceeding or, as in *Knox*, a prosecution for failure to file a required statement). *Id.* Or she can answer truthfully, and rely on the 5th Amendment to prevent the government from using any incriminating statements against her in a subsequent criminal case. There is no third option. If she elects to answer falsely, she chooses "a course that the Fifth Amendment gave [her] no privilege to take," and she has no defense to a charge based on the false declaration. *Id.*[4]

Finally, in *United States v. Mandujano*, 425 U.S. 564, 582 (1976), the Supreme Court squarely held that, even when the defendant's false testimony was elicited in violation of his constitutional privilege against self-incrimination, the 5th Amendment provides no basis for suppressing the use of that false testimony in a subsequent prosecution for perjury. This is so regardless of whether the defendant was told he had a right not to answer and could be prosecuted for answering falsely. *See United States v.*

---

[4] This Court used this same analysis and reached the same conclusion in *State v. Faulkner*, 75 S.W. 116, 138 (Mo. 1903), stating:

> In our opinion, because a court requires a witness, even erroneously, to testify to a matter which he is justified in refusing to answer, is no ground for charging the court with having compelled him to testify to that which is false. It may be and is wrong to require him to testify to the truth if it would incriminate him, but it cannot be said that, merely because it wrongfully requires him to answer, it compels him to testify falsely. If he answers truthfully, he cannot be punished for perjury; and, as already said, he has two modes of redress if called upon to testify to that which is privileged. He may decline, and claim his privilege, and have his redress by habeas corpus, if imprisoned; or, if he yields, and saves his exceptions, he can appeal, and have the judgment reversed, as is often done.

*Wong*, 431 U.S. 174, 178 (1977) ("failure to provide a warning of the privilege, in addition to the oath to tell the truth, does not call for a different result"). Not only does the use of such testimony in a subsequent perjury trial not violate the 5th Amendment, it is not "so fundamentally unfair as to violate due process." *Id.* at 180. In short, "as the Court has consistently held, perjury is not a permissible way of objecting to the Government's questions." *Id.* at 180. [5]

Accordingly, even assuming that Churchill had (and properly asserted)[6] a constitutional privilege against self-incrimination during the initial protective custody hearing, and even assuming that the judge violated this privilege by making Churchill testify, this privilege does not entitle her to commit perjury or prohibit the state from using her false testimony against her to prove that crime. The privilege applies only to a statement that constitutes an ***admission*** about a completed (or ongoing) crime, not a statement that constitutes a criminal ***act*** in itself, e.g., perjury.

---

[5] *State v. Caperton*, 207 S.W. 795 (Mo. 1918), cited by Churchill, does not compel a different result. There, the defendant's conviction was reversed on the basis of instructional error. Nevertheless, the Court noted that – even though the defendant never claimed that the use of his false testimony to the grand jury was a violation of his constitutional privilege against self-incrimination – that objection (had he made it) "ought to have been sustained." *Caperton*, 207 S.W. at 796. Not only was this statement *dicta*, but it also was contrary to *Faulkner* (which came before it) and was squarely overruled by *Mandujano* and the other cases decided after it.

[6] The constitutional privilege against self-incrimination provides no protection unless it is timely invoked, and this must be done explicitly. Here, though Churchill made it clear that she preferred not to testify until she had obtained counsel, she made no attempt to assert a constitutional privilege against self-incrimination.

17

## II.     *Sufficiency of the Evidence to Support Churchill's Conviction*

Finally, Churchill claims that even if her false testimony from the initial protective custody hearing was properly admitted, her perjury conviction must be overturned because there was insufficient evidence to prove the elements of that crime.  First, she claims the state failed to prove she knowingly gave false testimony concerning a "material fact."  Second, Churchill claims that she "retracted" her false testimony more than two weeks after the protective custody hearing when she delivered JC to the juvenile officer.

### A.     *Materiality*

"A person commits the crime of perjury if … he knowingly testifies falsely to any material fact … in any official proceeding before any court[.]"  § 575.040.1, RSMo 2000.  Churchill concedes that the protective custody hearing was an "official proceeding," and she concedes she knowingly gave false testimony at that hearing.  Her claim is that the state failed to prove that her false testimony was material because, in her words, "whether [the judge] believed or disbelieved [Churchill's] statement about the existence of [JC], his actions would have remained the same."  This argument fails because it misstates the materiality element.

Under section 575.040.2, RSMo 2000, a "fact is material … if it could substantially affect, or did substantially affect, the course or outcome of the cause, matter or proceeding."  Here, the "fact" about which Churchill testified was *whether* JC existed.  That fact was material to the initial protective custody hearing because, without the

18

existence of the child, the court had no jurisdiction to act and no one to protect with its custody.

Churchill does not claim that the existence of JC was not material. Instead, she argues that her false testimony about JC was not material because it "did not 'substantially affect' the course or outcome of the proceedings – indeed, it did not affect anything except the timing of when the transfer of custody occurred." This statement illustrates the flaw in Churchill's argument because it is based on the mistaken premise that it is the false testimony which had to have altered (or at least could have altered) the course or outcome of the proceeding. This is incorrect. Under section 575.040.2, RSMo 2000, the "fact" must be material, not the lie. *See State v. Moran*, 115 S.W. 1126 (Mo. 1909) (false denial of prior convictions is material on the issue of credibility and can serve as a basis for a perjury conviction regardless of what impact, if any, truth about prior convictions would have had); *Faulkner*, 75 S.W. at 121 (perjury charge was proper even though grand jury had voted to indict before defendant gave false testimony).

Accordingly, the evidence was sufficient to prove that Churchill committed perjury because it proved she knowingly gave false testimony about whether JC existed and JC's existence was a fact that was material to the outcome of the initial protective custody hearing. It does not matter whether the judge (or anyone else) believed her or relied on her testimony. What matters is that the question of whether JC existed was the focus of the initial protective custody hearing and the judge was entitled to truthful testimony in resolving that question. Churchill swore an oath to provide such testimony and then knowingly and willfully lied about it.

19

### B.     Retraction

Churchill's final point on appeal is that the trial court erred in convicting her of perjury because she retracted her false testimony more than two weeks later when she produced JC to the juvenile officer.

Churchill relies on section 575.040.4, RSMo 2000, which provides a "defense to a prosecution under subsection 1 of this section [if] the actor retracted the false statement in the course of the official proceeding in which it was made provided he did so before the falsity of the statement was exposed."  According to Churchill, her delivery of JC to the juvenile officer was "in the course of" the same protective custody proceeding in which she gave false testimony because her delivery (though not timely) resulted from the judge's order and original summons.

The phrase "in the course of the official proceeding" suggests that the retraction has to occur on the same day or in the same hearing as the original perjury.  But this is not so.  Section 575.040.4 gives this phrase a broad meaning such that, in a criminal case, perjury committed before a grand jury can be retracted even at the criminal trial.  Even so, it is not clear that this phrase is broad enough to encompass an act performed outside of court.  Instead, the statute requires that the retraction be in the form of truthful testimony; "retract" literally means to "take back" the false testimony.  Here, Churchill's delivery of JC to the juvenile officer was "testimony" only in the broadest sense.  Moreover, section 575.040.4 requires the defendant to retract the perjury "before the falsity of the statement was exposed."  It is clear that the falsity of Churchill's testimony was "exposed" long before Churchill admitted it by producing JC to the juvenile officer.

20

The Court need not reject Churchill's claim on these grounds, however. In a perjury trial, the burden of injecting the issue of retraction is on the defendant. § 575.040.5. Churchill never raised the issue of retraction to the trial court, either before or after her trial. Instead, she is raising this claim for the first time on appeal. Because the trial court cannot have erred by refusing to credit a defense she did not assert, Churchill's final point relied on is denied.

## Conclusion

For the reasons set forth above, the judgment is affirmed.

_____
Paul C. Wilson, Judge

Russell, C.J., Breckenridge, Fischer, Stith and
Teitelman, JJ., concur; Draper, J., dissents.

21